General Stencils, Inc. v. Commissioner. Joseph Klugman v. Commissioner.
General Stencils, Inc. v. Commissioner
Docket Nos. 4485-62, 4486-62.
United States Tax Court
T.C. Memo 1965-157; 1965 Tax Ct. Memo LEXIS 173; 24 T.C.M. (CCH) 835; T.C.M. (RIA) 65157; June 16, 1965
*173 Held: 1. Joseph Klugman realized no additional income in the years 1956 through 1958 from substantial deposits in bank accounts since they were made from cash acquired by him and his brother in earlier years. 2. Petty cash expenses of General Stencils, Inc., were overstated during the years 1956 through 1959. 3. The overstated petty ca expenses of the corporation constituted additional compensation to Klugman and are deductible as such by General Stencils, Inc. 4. General Stencils, Inc., is not liable for additions to tax under sec. 6653(a), I.R.C. 1954, for the years 1956 through 1959. 5. Joseph Klugman is liable for the additions to tax under sec. 6653(a), I.R.C. 1954, for the years 1956 through 1959. James Harte Levenson, 247 Park Ave., New York, N. Y., for the petitioners. Eugene L. Wilpon for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined deficiencies in the income taxes of General Stencils, Inc., and Joseph Klugman and additions to tax as follows: General Stencils, Inc.
Addition to Tax
Taxable
Sec. 6653(a),
Year
Deficiency
I.R.C. 1954
1956
$ 3,559.04
$ 177.95
1957
6,575.94
328.80
1958
4,377.11
218.86
1959
6,323.59
316.18
Joseph Klugman
1956
$ 18,129.59
$ 906.48
1957
252,902.26
12,645.11
1958
17,923.52
896.18
1959
8,788.64
439.43
*174 On respondent's oral motion, agreed to by petitioners' counsel, these cases were consolidated for trial, briefing, and opinion. The issues for decision are: (1) Whether Joseph Klugman realized additional income from unidentified bank deposits in each of the years 1956 through 1958; (2) whether petty cash expenses of General Stencils, Inc., were overstated during each of the years 1956 through 1959; (3) if the petty cash expenses were overstated, whether such amounts were additional compensation or constructive dividends to Joseph Klugman; (4) whether General Stencils, Inc., is liable for an addition to tax under the provisions of section 6653(a)[1] for each of the years 1956 through 1959; and (5) whether Joseph Klugman is liable for an addition to tax under the provisions of section 6653(a) for each of the years 1956 through 1959. Findings of Fact Some of the facts have been stipulated by the parties and are hereby found accordingly. General Stencils, Inc. (hereinafter called General), was incorporated in New York in 1925 and has its principal office at 827 East 92nd Street, *175 Brooklyn, New York. It is engaged in the business of manufacturing marking devices such as name plates, dials, signs, and stencils. General filed its corporation income tax returns for the years 1956 and 1957 with the district director of internal revenue, Lower Manhattan, New York, and for the years 1958 and 1959 with the district director of internal revenue in Brooklyn. Joseph Klugman (hereinafter called Joseph) is an individual who resides at 235 Rochester Avenue, Brooklyn, New York. He filed his Federal income tax returns for the years 1956 to 1959, inclusive, with the district director of internal revenue, Brooklyn, New York. Samuel Klugman (hereinafter sometimes referred to as Klugman, Sr.,) was the father of Joseph and his brother, Samuel W. Klugman (hereinafter called Samuel). At all times since the incorporation of General, Samuel has served as president, Joseph has been secretary, and Klugman, Sr., served as treasurer until his death on June 22, 1943. During his father's lifetime Joseph also served as vice president, but since the death of Klugman, Sr., he has been the secretary and treasurer. Joseph is the principal executive officer and the general manager of the *176 business. The common stock of General was originally held as follows: Samuel Klugman
48 shares
Joseph Klugman
1 share
Samuel Klugman, Sr.
1 share By his will, which was admitted to probate by the Surrogate's Court of Kings County, New York, Klugman, Sr., bequeathed his one share of stock to Joseph; and since June 22, 1943, Samuel has owned 48 shares and Joseph has owned 2 shares. Joseph was born on July 4, 1900. His formal education was completed in 1915 when he began work as an errand boy for Henry Morse & Company, a concern engaged in making marking devices. He soon demonstrated his skill and was made an apprentice, and later a full-fledged stencil cutter. In 1916 he enlisted in the United States Navy and served until his discharge in 1920. He then resumed his occupation as a stencil cutter, working for others until 1925. During the period from 1920 to 1925 Joseph also did such night work as a stencil cutter and free lance artist. When General was organized in 1925 Joseph started working for the company. The earlier years were lean and Joseph continued to do free lance art work for others in order to supplement his income. He did this until about 1939 *177 when General began doing its own etching. During the period from 1925 to 1939 Joseph earned approximately $100 per week. From 1940 to 1954, inclusive, Joseph received the following amounts of compensation from General: Year
Salary
1940
$ 1,398.50
1941
4,703.55
1942
6,005.00
1943
6,200.00
1944
8,721.14
1945
12,000.00
1946
9,888.13
1947
7,950.00
1948
7,950.00
1949
7,950.00
1950
7,950.00
1951
15,180.00
1952
9,275.00
1953
14,045.00
1954
9,010.00
Total
$128,226.32
From 1956 through 1959, the years here in issue, Joseph received the following amounts as salary from General: Year
Salary
1956
$10,350.00
1957
9,350.00
1958
9,520.00
1959
9,010.00
Joseph was a prodigious worker, often at his job 7 days a week and 18 hours a day. His responsibility for the shop work included etching, greasing and polishing metals, art work, photography and reproductions, tool and dye making, typesetting, and compositions. Joseph had 15 savings accounts at various banks in the New York City area between the years 1929 and 1962 with deposits totaling about $10,000. Joseph also has United States Savings Bonds (Series E) now worth $5,000 *178 which were purchased by his father and given to him. They are kept in his safe deposit box at the National City Bank at Canal and Broadway. Samuel was born on August 15, 1902. He graduated from high school in 1919 and then went to work as a fur cutter. He was engaged in that occupation until 1930. During this period Samuel's earnings were: $2,500 per year from 1919 through 1923; $4,000 per year in 1924 and 1925; and $5,200 per year from 1926 to 1930. In 1930 Samuel joined his father in the real estate business where he managed rental properties and made appraisals. In 1934 he also did alteration work for real property owners in addition to working for his father. From 1930 through 1934 Samuel earned around $2,500 each year. In 1936 Samuel became an employee of the City of New York and is still so employed. Except for the first 2 years of his employment, Samuel's hours of work were from 4 p.m. to midnight, Wednesday through Sunday. Because of these hours Samuel was able to carry on his other business activities. Samuel's annual earnings from the City of New York from 1936 to 1959, inclusive, were as follows: Year
Salary
1936
$ 617.00
1937
900.00
1938
1,080.00
1939
1,185.00
1940
287.00
1941
1,320.00
1942
1,440.00
1943
1,165.00
1944
1,560.00
1945
1,800.00
1946
2,160.00
1947
2,520.00
1948
2,815.00
1949
2,710.00
1950
2,830.00
1951
3,158.00
1952
3,382.00
1953
0
1954
3,834.00
1955
4,097.00
1956
4,900.00
1957
4,508.00
1958
4,705.00
1959
2,921.00
Total
$55,894.00
*179 On August 6, 1937, Samuel and his father formed the Premier Construction Corporation with each owning one-half of the stock. When Klugman, Sr., died in 1943 he left his shares to Samuel. Premier was engaged in the construction business until 1944. Samuel and his father received some income from Premier, although the exact amounts are not known. In 1943 Samuel entered St. John's University School of Law, after completing 2 years of prelaw studies at New York University. He later graduated and was admitted to the New York bar in 1948. From 1940 to 1954, inclusive, Samuel received the following amounts of compensation from General: Year
Amount
1940
none
1941
none
1942
$ 3,500.00
1943
1,250.00
1944
3,650.37
1945
5,200.00
1946
3,445.00
1947
3,510.00
1948
3,445.00
1949
3,445.00
1950
3,445.00
1951
3,640.00
1952
3,775.00
1953
3,775.00
1954
3,610.00
Total
$45,690.37
Samuel had eight savings accounts with banks from 1944 to 1948 in which he had deposits totaling $15,327.49. He also has United States Savings Bonds (Series E) now worth $5,000 which were purchased by his father and given to him. They are kept in his safe deposit box at the *180 East New York Savings Bank. Samuel Klugman, Sr., was born in Central Europe in 1870. He came to the United States at the age of 17. He engaged in several businesses, such as a spice store, granaries, and grain mills. He also processed furs and sold them. However, after 1920 he was engaged principally in the real estate business. In 1918 Klugman, Sr., Joseph, Samuel, and two sisters moved into a four and one-half room flat located at 235 Rochester Avenue in Brooklyn. The rental was $19 a month. The sisters married in the early 1920's and moved out. Joseph, Samuel, and their father lived together in the flat until the father's death in 1943. Samuel still lives in the flat at a monthly rental of $43.40. Joseph lived with his brother until 1958 when he began occupying small quarters on the top floor of the factory building used by General. During his lifetime, Klugman, Sr., paid all the household expenses, including the rent. Such expenses were shared by Joseph and Samuel from June 1943 to 1958. Joseph and Samuel have lived frugally and in seclusion. Neither of them drink nor smoke. The have no social life. Their living habits are ascetic. Their expenses for the necessities of *181 life are minimal. Samuel has never married. Joseph was married for 1 year (1921), but separated from his wife and did not thereafter contribute to her support. He obtained a divorce in 1927. From 1920 to 1943 Klugman, Sr., made frequent gifts in cash to Joseph and Samuel. They were usually made about five times each year in amounts of $500 or $600. The sons placed some of the money in their safe deposit boxes in banks and some was placed in metal strong boxes secreted in the closets of their flat. Since early 1930 Samuel has had a safe deposit box in the East New York Savings Bank. By January 1, 1956, Samuel had approximately $20,000 in cash, consisting of 5, 10, and 20 dollar bills, in his safe deposit box. Also by January 1, 1956, Samuel had accumulated a substantial amount of cash (5's, 10's and 20's) in a large metal box which was hidden behind the clothing in his closet. Joseph rented a safe deposit box at the National City Bank, Canal and Broadway, in the 1940's. By January 1, 1956, he had $25,000 in cash, mostly 20's, in his safe deposit box. In addition, he had about $10,000 in cash in another safe deposit box at the East New York Savings Bank. Besides these two safe *182 deposit boxes, Joseph had (1) a large metal box, lined with asbestos and weighing about 50 pounds, which was bolted to a closet shelf and wall, (2) three other smaller metal boxes, and (3) a home safe known as an "X-chest." The "X-chest" is cubic in shape, each dimension being about 2 feet. It weighs 1,700 pounds, has a one-eighth inch copper lining and a 4 inch thick precision door. It also has a thermostat that sets off an alarm if heat is applied. In these boxes Joseph kept a substantial amount of cash. Both Joseph and Samuel knew about how much money each of them had accumulated and each knew where the strong boxes of the other were located. For many years Joseph and Samuel had shared the desire to buy land and construct on it a new plant specially built for General. They hoarded cash for that purpose. In 1956 they believed they had enough. They needed $230,000 exclusive of land cost. Since neither of them had ever borrowed money and General had never borrowed except from its stockholders, Joseph and Samuel were not willing to purchase the land and construct a building unless they could do it without financing. After counting the cash they had accumulated, which was close *183 to $300,000, they then proceeded on December 21, 1956, to have Premier Construction Corporation, then inactive but completely controlled by Samuel, enter into a contract with Rising Sun Realty Company, an unrelated enterprise, under which Premier agreed to purchase certain land. Premier was used for this purpose because a new corporation had not yet been created to take title. Since Premier did not have a bank account, Samuel opened one, made a cash deposit therein and Premier drew its check for $5,000 to the order of Rising Sun Realty Company. Thereafter, on January 29, 1957, Joseph and Samuel formed Josak Realty Corporation to take title to the property and to construct the new plant for General. Josak is owned equally by Joseph and Samuel. Josak opened a bank account on January 30, 1957, in the Manufacturers Trust Company. Josak made additional deposits for the land and for the construction of the building. Josak obtained these funds by deposits made by Joseph and Samuel. The deposits, mostly made in cash, were as follows: Deposit With:
Name of Account
1956
1957
1958
Manufacturers Trust
Josak Realty Company
$ 5,000.00
$217,546.00
$14,302.00
Co.
Manufacturers Trust
Premier Constr. Corp.
6,000.00
43,765.77
Co.
National City Bank
General Stencils, Inc.
9,000.00
21,000.00
Totals
$20,000.00
$282,311.77
$14,302.00
*184 The cash came from the hoard accumulated by Joseph and Samuel. The following bank deposits made by checks, and treated by respondent in his notice of deficiency as taxable income to Joseph, do not constitute additional income: (a) Deposits aggregating $9,000 made in the National City Bank to the account of General in 1956. (b) Deposit of $5,000 made in the National City Bank to the account of General in 1957. (c) Deposits aggregating $24,880.77 made in the Manufacturers Trust Company to the account of Premier in 1957. (d) Deposit of $5,000 made in the Manufacturers Trust Company to the account of Josak in 1956. Josak credited Joseph and Samuel with one-half of the deposits made. In part these deposits were treated as capital, open loans, and each brother was given a $100,000 mortgage. Construction work on the new building began in March 1957. Josak did not engage a general contractor. Instead, Joseph acted as the general contractor in the construction of the new building, operating through subcontractors in the different trades. This required long hours and hard work by Joseph. The building was completed in April 1958 at a total cost of approximately $230,000. In the *185 course of the construction work Joseph sometimes bought small items for the mechanics and paid for them in cash. He also bought from time to time tools and equipment needed by General and paid for them in cash. Joseph sometimes held business conferences at mealtimes and paid for such meals in cash. He was not reimbursed for any of these expenditures. On its income tax returns General claimed the following petty cash expenses: Year
Amount
1956
$14,480.51
1957
18,970.89
1958
20,592.37
1959
21,916.91 In his notice of deficiency respondent allowed $2,600 for petty cash expenses for each of the years 1956 through 1959. Out of the sums disallowed as unsubstantiated petty cash disbursements to General and attributed by respondent to Joseph as constructive dividends, the respective amounts of $2,405.34, $4,199.92, $6,707.43, and $5,750.38 were embezzled during the years 1956 to 1959, inclusive, by an employee and were not received by Joseph. Joseph took $250 from General each week during the years 1956 through 1959 which was charged on General's books as petty cash. Joseph maintained no records of his alleged expenditures on behalf of General for the $250 withdrawn *186 as petty cash. Some of the money was paid for Joseph's personal expenses. General likewise kept no records of the petty cash expenses. The corporation income tax returns of General for the years in issue reflect earned surplus in 1956 and 1957 in the respective amounts of $17,159.30 and $18,372.67 and deficits in earned surplus in 1958 and 1959 of $8,990.91 and $6,055.85. General did not declare or pay any dividends to Joseph or Samuel during the years 1956 through 1959. General had the following sales and gross income for the years in issue: Gross In-
Year
Sales
come
1956
$331,980.73
$167,779.64
1957
300,745.73
169,007.97
1958
258,627.71
159,623.30
1959
338,547.05
96,268.67
Joseph was inadequately compensated by General for many years. The reasonable compensation of Joseph for services actually rendered to General during the years 1956 through 1959 was at least equal to the salaries received by him plus the amounts of petty cash withdrawn and used by him. Ultimate Findings 1. None of the deposits made by Joseph and Samuel with the Manufacturers Trust Company and the National City Bank in the accounts of Josak Realty Company, Premier *187 Corporation, and General Stencils, Inc., during the years 1956, 1957, and 1958 constitute taxable income to Joseph in such years. 2. General overstated its petty cash expenses for the years 1956, 1957, 1958, and 1959 in the amounts of $8,175.14, $10,870.97, $9,984.94, and $12,266.53, respectively. 3. The overstated petty cash expenses of General constitute additional compensation to Joseph for the years in issue and are deductible by General as ordinary and necessary business expenses. 4. Joseph's failure to keep records of the amounts he withdrew as petty cash from General and his understatement of income for the years in issue were due to negligence. Opinion 1. Bank Deposits. The first and most important issue in these consolidated proceedings relates to substantial cash deposits made in the Manufacturers Trust Company and the National City Bank during the years 1956, 1957, and 1958. Respondent maintains that the deposits are unexplained and therefore constitute taxable income to Joseph for the years in which they were made. Joseph, on the other hand, contends that the deposits were made by him and Samuel and represent their combined lifetime savings and gifts received *188 from their father. We agree with petitioner. The complete facts are set forth in our findings and it would serve no useful purpose to reiterate them. Suffice it to say that while the story of the Klugman brothers may be strange and unusual, we believe their testimony concerning their mode of living and the cash hoard they accumulated between 1920 and 1956. They were straight-forward and truthful witnesses. Each testified in detail as to their earnings, their sources of income and the gifts received from their father. The story of their lives was extraordinary. Unquestionably they lived frugally; they worked constantly; they had no social life; and they never borrowed money from anybody. They were indeed eccentric misers. We are convinced that the money deposited in the banks during 1956, 1957, and 1958 came from their cash hoard and was used for the purpose of constructing the new factory building for General. Accordingly, we find for the petitioner Joseph Klugman on this issue. 2. Petty Cash Expenses. Joseph admittedly took $250 each week in cash from General during the years 1956 through 1959 which was charged on the corporate books as petty cash. After making allowance for *189 petty cash embezzled by an employee of the corporation, the respondent determined that the petty cash expenses of General were overstated for the years 1956 through 1959 in the amounts of $9,475.17, $12,170.97, $11,284.94, and $13,566.53, respectively, all of which was converted to Joseph's personal use. Respondent did allow $50 per week for petty cash expenses in arriving at the overstated amounts. General kept no records of the expenses and neither did Joseph. In fact, he testified that General paid for some of his personal expenses. Although we believe that some of the petty cash withdrawn by Joseph was spent to buy tools, small equipment, lunches, and other things for the business, we do not know the exact items or the amounts. Joseph's testimony in this respect was very general. Exercising our best judgment, we have decided to allow an additional $1,300 as petty cash expense for each year. In doing so we have chosen to bear heavily against Joseph because his inexactitude regarding such expenditures is of his own making. Cohan v. Commissioner, 39 F. 2d 540, 544 (C.A. 2, 1930). We therefore hold that General overstated its petty cash expenses in the amounts set out *190 in our ultimate findings. 3. Treatment of Overstated Petty Cash Expenses. Respondent contends that Joseph received constructive or informal dividends in the amounts of the overstated petty cash expenses. This contention is predicated on the general principle that any distribution out of earnings and profits is taxable to the recipient as dividend income, even though a dividend is not formally declared. Cf. 58 th Street Plaza Theatre, Inc., 16 T.C. 469 (1956), affd. 195 F. 2d 724 (C.A. 2, 1952). Without retreating from their primary contention that Joseph spent all of the petty cash on the business of General, the petitioners argue, alternatively, that any disallowed portion of the petty cash expenses should be taxed to Joseph as additional compensation, and not as a dividend, and that General should be allowed a deduction. While the question is not entirely free from doubt, we are inclined to agree with petitioners. In reaching the conclusion that the overstated petty cash expenses should be treated as additional compensation to Joseph, we have taken into consideration such factors as the size of the business; generally favorable economic conditions *191 existing at that time; the ratio of compensation to sales and to gross income; Joseph's minority (4 percent) stockholder interest; Joseph's technical training, skill, and knowledge of the business; the extent and scope of Joseph's work and his personal contribution to the operation and success of General's business; the unavailability of other persons to assume his responsibilities; and the inadequacy of his compensation in earlier years. The extent and character of the services rendered by Joseph are quite impressive. He devoted every waking hour to the business. Cf. Universal Steel Co., 5 T.C. 627 (1945), and Orange Securities Corp., 45 B.T.A. 24 (1941). Accordingly, we sustain the petitioners on this issue and hold that the overstated petty cash expenses are taxable as additional compensation to Joseph. This being so, such amounts are deductible by the corporation. Alabama-Georgia Syrup Co., 36 T.C. 747, 769-770 (1961), reversed on another issue, sub nom. Whitfield v. Commissioner, 311 F. 2d 640 (C.A. 5, 1962). 4. Additions to Tax. Since we have found that the amounts in controversy are deductible as ordinary and necessary *192 business expenses of General, it follows that General is not liable for any addition to tax under section 6653(a). However, Joseph maintained no records of his expenditures of money taken from petty cash and he did substantially understate his taxable income for each of the years 1956 through 1959. In our opinion this was due to negligence and we thus conclude that he is liable for the addition to tax imposed by section 6653(a). Cf. Carroll F. Schroeder, 40 T.C. 30 (1963). To reflect the concessions of the parties and the determinations made herein, Decisions will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 unless otherwise stated.↩