ALFRED H. TOLZMAN AND MILDRED B. TOLZMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Tolzman v. Commissioner
Docket No. 4668-78.
United States Tax Court
T.C. Memo 1981-689; 1981 Tax Ct. Memo LEXIS 53; 43 T.C.M. (CCH) 1; T.C.M. (RIA) 81689; December 2, 1981. *53 Petitioner was president of ULT Co. but had no direct interest therein. However, he had a one-fourth interest in a partnership which owned 50 percent of ULT Co. Petitioner guaranteed notes of ULT Co. representing loans from a bank, and subsequently executed a deed of trust on his residence to secure the notes. ULT Co. became insolvent and ceased doing business in the latter part of 1969 but interest was paid on the notes up to December 1971. The bank assigned the notes and deed of trust to M, who demanded payment from petitioner and bought a foreclosure suit against petitioner in January 1972 which petitioner resisted. Judgment was entered against petitioner in 1974 for a part of the principal and interest thereon from December 1, 1971, which, along with M's and his own attorney's fees, petitioner paid in 1974. Held: 1. The principal amount petitioner paid under the guarantee arrangement is deductible as a nonbusiness bad debt under section 166(d), I.R.C. 1954, rather than as a business bad debt. 2. The interest paid by petitioner, which accrued after the demand for payment, is deductible under section 163(a). 3. The legal fees paid by petitioner are deductible under sections *54 162(a) and 212(2). John H. Hessey IV, for the petitioners. Robert A. Miller, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined a deficiency in petitioners' Federal income tax for taxable year 1974 in the amount of $ 6,159. The issues presented for decision are: (1) Whether petitioners are entitled to a business bad debt deduction under section 166(a)(1)[1] for amounts paid as guarantors of corporate notes, (2) whether petitioners are entitled to a deduction under either section 163(a), 166(a) or 166(d) for amounts paid as interest with respect to the corporate notes, and (3) whether petitioners are entitled to a deduction under either section 162(a) or 212(2) for legal expenses paid with respect to litigation concerning the corporate notes. [2] *55 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners Alfred H. Tolzman (hereinafter petitioner) and Mildred B. Tolzman, husband and wife (hereinafter collectively referred to as petitioners), resided in Baltimore, Md., at the time of filing the petition herein. They filed a joint Federal income tax return for taxable year 1974. In 1962 the United Leaf Tabacco Corporation (hereinafter referred to as ULTC) was organized by the First Construction Company (hereinafter First Construction), a Maryland partnership in which petitioner owned a 25 percent interest, and by Rudolf Walti (hereinafter Walti). ULTC's business consisted of purchasing tobacco which was later sold to its domestic and foreign customers. At all relevant times First Construction and Walti were 50 percent shareholders of ULTC. *56 At the time ULTC was organized in 1962, First Construction transferred to it some machinery and equipment and Walti transferred to it some tabacco inventory stock, in return for which they each received a 50 percent interest in ULTC. Petitioner served on the Board of Directors of ULTC, representing First Construction's interests in ULTC. As of April 14, 1969, First Construction's equity investment in the stock of ULTC was $ 25,000 and ULTC was indebted to First Construction in the amount of $ 44,845.58. Petitioner, by virtue of his 25 percent ownership interest in First Construction, owned $ 6,250 worth of the ULTC stock and $ 11,211.39 of the debt. In addition, ULTC owed directly to petitioner $ 54,000 for loans he had periodically made to ULTC between 1962 and 1969. [3] Thus petitioner's direct and indirect investment in ULTC totaled $ 71,461.39. Petitioner served as president of ULTC from *57 1962 to August 3, 1969, when he resigned. Walti served as vice president and director and became president on ptitioner's resignation. Petitioner's duties consisted primarily of taking care of ULTC's domestic trade customers and purchasing pipe tobacco which was eventually sold overseas. Petitioner received $ 13,250 and $ 7,750 in salary for these services for 1968 and 1969, respectively. [4] He never received more than $ 13,250 in salary from ULTC. Petitioner's gross income from taxable year 1968 including his salary, share of income from First Construction, director's fees, interest, dividends and capital gain, totaled $ 26,022.98 on which petitioner paid $ 5,267.13 in Federal income taxes. Petitioner's effective tax rate was approximately 20 percent and thus his $ 13,250 salary produced approximately $ 10,600 net after Federal income tax and before any State income tax. Petitioner's gross income for 1969, exclusive of his ULTC salary, was $ 17,688.42. Prior to August 1969, Petitioner had a *58 series of disputes and disagreements with Walti and Terry Weis (hereinafter Weis), the secretary and treasurer of ULTC and the third member of its Board of Directors. ULTC conducted significant foreign business and often received orders and communications written in German, Spanish, French and Italian. Weis and Walti, who were fluent in these foreign languages, refused to translate the correspondence for petitioner, who was not fluent in these foreign languages. As a result, petitioner was often unaware of the content of recent orders and communications from foreign clients. This caused petitioner great frustration and embarrassment when meeting with the foreign customers since they often would ask petitioner about their orders or recent communications of which petitioner had no knowledge. In addition, Walti, with the influence of Weis, blocked a proposed consolidation of ULTC and a competitor of which petitioner was in favor. Due to these disputes, petitioner found he could no longer work with Weis and Walti and on August 3, 1969, he voluntarily resigned his position as president of ULTC. Petitioner was 59 years of age when he resigned. Seven months later, in April of 1970, *59 petitioner found another job with a tobacco broker performing substantially the same duties as he had for ULTC in Maryland. These duties lasted only about 2 months. Petitioner had waited until April 1970 to seek new employment since he had resigned his position with ULTC at a time when the tabacco market was no longer in season in his home State of Maryland. [5] Petitioner continued in the tabacco business up to the date of trial but with whom, in which capacity, and under what terms and conditions the record does not reveal. Petitioner was a member of the Board of Directors of the State Tobacco Authority and had worked in the tabacco industry for over 40 years at the time he resigned from his position with ULTC. Expertise in the tabacco industry is acquired primarily by active participation in the industry rather than by formal schooling. Petitioner considered himself to be an expert in the tobacco business and to have one of the best reputations *60 in that industry in the world. On July 1, 1968, ULTC borrowed $ 39,000 from the Suburban Trust Company (hereinafter Suburban) evidenced by a note bearing 7-1/2 percent interest per annum on the unpaid balance. On December 30, 1968, ULTC borrowed an additional $ 75,000 from Suburban evidenced by a note bearing 8 percent interest per annum on the unpaid balance (hereinafter the loans from Suburban will be collectively referred to as the notes). Both of these notes were guaranteed by Walti, his wife, Marianne (hereinafter collectively referred to as the Waltis), and by petitioners on December 30, 1968. By signing the notes as guarantors, the Waltis and petitioners subjected themselves to a potential liability that exceeded $ 114,000 in the event ULTC defaulted on payment on the notes. [6] On April 14, 1969, the Waltis and petitioners executed a deed of trust upon their respective personal residence to provide Suburban with additional security for the loans made to ULTC. In the latter part of 1969, ULTC became insolvent and ceased operations, failing to pay on the two loans from Suburban. Petitioners thereby became liable for repayment of the notes under the contract of guaranty. *61 Prior to 1971, Walti borrowed $ 50,000 from E. Lucille McCauley (hereinafter McCauley) giving as security therefore a second deed of trust on his personal residence. When Surburban threatened to foreclose its first deed of trust in 1971, McCauley purchased the first deed of trust notes from Suburban. She thereafter foreclosed the second deed of trust on Walti's personal residence and bought it at the sale. As a part of the foreclosure proceedings McCauley released Walti from all liability on the first deed of trust notes. The Waltis were Swiss nationals and they absconded from the United States prior to 1971. On January 12, 1972, McCauley instituted proceedings to foreclose the first deed of trust on petitioners' personal residence. Petitioners resisted the foreclosure proceeding on the grounds that the release of the Waltis also released them from the deed of trust. Alternatively, if it was found that they had *62 not been so released, they asked the Maryland court to determine the amount of their liability under the notes. Folliwng two years of litigation, the Court of Special Appeals of Maryland held that petitioners were still liable on the noes subject to the first deed of trust and that they were indebted to McCauley for $ 47,892.42. In addition, the Maryland court awarded interest on this amount from December 9, 1971, [7] to the date of the Court's judgment on August 23, 1974, totaling $ 11,341, and petitioners were ordered to pay McCauley's attorney fees. In 1974, petitioners paid the balance of $ 47,892.42 due on the two notes and interest of $ 11,341. Petitioners also paid legal fees to McCauley's attorneys and their own attorneys of $ 1,834 and $ 4,268, respectively. For taxable year 1974 petitioners deducted the interest paid on the notes that had accrued from December 9, 1971, to the date of the court's judgment on August 23, 1974. In addition, they deducted the legal expenses paid to McCauley's attorneys and their own attorneys. Finally, on April 23, 1976, petitioners timely filed an informal refund claim 7a *63 whereby they asserted that the $ 47,892.42 paid in connection with their guarantee of ULTC's notes was deductible as a business bad debt under section 166(a). In the statutory notice of deficiency, respondent disallowed all of the above deductions in their entirety. OPINION The first issue is whether for taxable year 1974, petitioners are entitled to a business bad debt deduction under section 166(a)(1)[8] for amounts paid as guarantors of two corporate notes. Petitioners contend that their dominant motive in guaranteeing the notes was to protect petitioner's employment with ULTC and thus the payments are deductible in full as business bad debts under section 166(a). Respondent maintains that petitioners' dominant *64 motive was to protect petitioner's investment in ULTC and therefore the payments qualify as a nonbusiness bad debt deductible only as a short-term capital loss [9] under section 166(d). [10] *65 The rules for determining whether a direct loan gives rise to a business or nonbusiness debt apply to debts which guarantors acquire by subrogation. Putnam v. Commissioner, 352 U.S. 82 (1956); secs. 1.166-8 and 9, Income Tax Regs. Both are determined under section 166, I.R.C. 1954. Since the transactions here involved took place prior to 1976 and involved the guarantee of corporate obligations, the debt was a nonbusiness debt unless petitioner proves that it falls within the exceptions of sections 166(d)(2)(A) or (B). See Sec. 1.166-8(b), Income Tax Regs., and compare with sec. 1.166-9, Income Tax Regs. And since petitioner was not engaged in a trade or business related to the guarantees at the time the debt was paid and became worthless, the debt does not avoid the definition of nonbusiness debt under section 166(d)(2)(B). See sec. 1.166-5(b)(2), Income Tax Regs.; Rollins v. Commissioner, 276 F.2d 368 (4th Cir. 1960), affg. 32 T.C. 604; Felmann v. Commissioner, 77 T.C. 564 (1981). So petitioner must prove that at the time the guarantees were made, or "created or acquired" as provided *66 in section 166(d)(2)(A), they were made in connection with his then trade or business. In order for the loss resulting from the worthlessness of a debt to be deductible as a business bad debt, there must be a proximate relationship between the loss and the trade or business of the taxpayer. Sec. 1.166-5(b), Income Tax Regs. In determining whether this relationship is present, the proper measure is that of the taxpayer's dominant motivation; only significant motivation is not sufficient. United States v. Generes, 405 U.S. 93 (1972), rehearing den. 405 U.S. 1033 (1972). In the present context that determination must be made as of the time the guarantee agreement was entered into; Roussel v. Commissioner, 37 T.C. 235 (1961); French v. United States, 487 F.2d 1246 (1st Cir. 1973). That is, when petitioner guaranteed the notes of ULTC was his dominant motive to protect his job and salary or was it to protect his investment in ULTC. In this case there was no other motivation for the guarantee as there was in Smith v. Commissioner, 60 T.C. 316 (1973), where the taxpayer also sought to protect his credit rating. The determination of petitioners' dominant motive is a question of fact *67 on which petitioner bears the burden of proof. Smith v. Commissioner, 55 T.C. 260 (1970). In applying the dominant-motive test the Court is required to give proper emphasis to objective factors rather than subjective factors. United States v. Generes, supra at 104. One important factor is the amount of the taxpayer's after-tax employment income compared to the amount of his investment in the corporation. United States v. Generes, supra at 106-107. In determining the amount of a taxpayer's investment, prior loans made by the taxpayer are considered part of his investment. Smith v. Commissioner, supra at 319. Applying the dominant-motive test in the instant case, we cannot find that petitioner's dominant motive in guaranteeing ULTC's notes were to protect his employment rather than his investment. Petitioner received $ 13,250 in pre-tax salary from ULTC in 1968, the year in which he guaranteed the notes. At no time did his salary from ULTC ever exceed this amount. Petitioner's net after-Federal-tax salary for 1968 was $ 10,600. Petitioner's total investment in ULTC as of April 14, 1969, equaled $ 71,461.39. [11] Comparing petitioner's salary after Federal income taxes to his investment *68 shows that his net after-Federal-tax salary was considerably less than one-sixth of his investment in ULTC. In Generes, where the Supreme Court found the taxpayer was protecting his investment, the taxpayer's salary was one-fifth of his original investment in the corporation. Petitioners argue *69 that their case is distinguishable from Generes. Specifically, petitioner was 59 years old at the time he guaranteed the notes and believed it would be difficult to find comparable employment at his age. Petitioners argue that the fact that petitioner was unble to find employment until seven months after he left his position with ULTC supports petitioner's belief that it would be difficult to find comparable employment. Finally, petitioner testified that his dominant motive in guaranteeing the notes was in fact to save his job. Although it is true that petitioner was 59 years old at the time the notes were guaranteed and would thus seemingly have a difficult time obtaining comparable employment at such age, it must be noted that petitioner did not obtain his employment with ULTC until he was 52 years old. Furthermore, petitioner was a member of the Board of Directors of the State Tabacco Authority, had worked in the tabacco industry for over 40 years and considered himself an expert in the industry with a reputation known throughout the world. It is difficult to conceive how an individual with such qualifications could believe it would be difficult to find employment comparable *70 to that which he had found just seven years earlier. As to petitioner's claim that his testimony is supported by the fact that he could not find comparable employment for seven months after he left ULTC, it must be noted that petitioner delayed looking for another job for seven months until the tabacco season resumed in Maryland. Once petitioner began looking, he immediately found similar employment. We recognize that protection of his salary is not the only factor to consider in determining whether petitioner's primary motivation was to protect his trade or business of being an employee. He was president of ULTC and this was undoubtedly a better job than being a mere employee. However, petitioner voluntarily resigned that job without withdrawing his investment interest as hereinafter discussed. Our analysis of other objective factors present in this case buttresses our conclusion. From 1962 through 1969, petitioner had plowed back into the corporation through loans a total of $ 54,000, an average of more than $ 7,500 per year. This exceeded over one-half of petitioner's annual salary for the entire time he was with ULTC. It seems more likely that petitioner would guarantee *71 the notes to save his substantial and increasing investment in ULTC than he would to save a salary that never exceeded $ 13,250 per year, especially in view of the fact that he was consistently throughout the years reinvesting an amount of money which was well over one-half of his salary. See United States v. Generes, supra at 106-107. Finally, we note that petitioner resigned his position with ULTC in August of 1969, a mere 14 months after guaranteeing the first note and a mere four months after giving the Deed of Trust. Petitioner represented First Construction, which was a 50 percent shareholder in the corporation. As such, he could not be forced to resign. Yet, after a series of disputes with Walter and Weis, petitioner voluntarily resigned. Although we do not doubt that the disputes were significant or that they caused petitioner great consternation, we do not believe that petitioner would subject himself to a potential liability of $ 114,000 to save his employment, and then shortly thereafter resign his position due to disputes of this type. Accordingly, we find that petitioner's dominant motive at the time he guaranteed the notes were to protect his investment in ULTC, not *72 his employment, and petitioners' payments as guarantors of the corporate notes are thus deductible only as a nonbusiness bad debt under section 166(d). The second issue is whether for the taxable year 1974 petitioners may deduct under either section 163(a), [12] 166(a) or 166(d) amounts paid for interest accruing subsequent to the insolvency of ULTC. [13]
Petitioners put forth four arguments to support the deduction. First, petitioners assert that following the insolvency of ULTC they had become directly and primarily liable on ULTC's notes and amounts paid for interest accruing subsequent to that time were paid with respect to petitioners' own indebtedness and as such are deductible under section 163(a). Second, petitioners assert that the payments are deductible *73 as interest by virtue of section 1.163-1(b), Income Tax Regs., which allows the taxpayer to deduct interest paid on a mortgage [14] upon real estate of which he is the legal owner, even though the taxpayer is not directly liable upon the bond or note secured by such mortgage. Third, petitioners assert that the interest paid is allowable as part of a business bad debt deduction under section 166(a) since petitioner's dominant motive in guaranteeing the notes and paying the interest thereon was to protect his employment; and finally, petitioners assert that in the event the interest is found to be not deductible under one of the above sections, then it is dedctible as a nonbusiness bad debt under section 166(d). Respondent has countered with the following: "First, that petitioners' liability was not as primary obligors that rather as guarantors and thus the interest payments made by petitioners were not made on their own indebtedness and therefore such payments are not deductible under section 163(a); second, that section 1.163-1(b), Income Tax Regs., *74 allows taxpayers to deduct interest paid on a mortgage upon real estate of which the taxpayer is the legal owner even though the taxpayer is not directly liable on the bond or note secured by such mortgage, only where the original loan was made to the taxpayer and, since this was not the case, section 1.163-1(b), Income Tax Regs., is inapplicable; third, that petitioner's dominant motive in guaranteeing the notes was to protect his investment and any interest payments made pursuant thereto are not deductible as a business bad debt deduction under section 166(a). Finally, respondent concedes that the interest payments are deductible as a nonbusiness bad debt under section 166(d). We agree with petitioners' first contention and in light thereof find it unnecessary to decide the other arguments made by the parties. Section 163(a) allows a deduction for interest paid or accrued within the taxable year on indebtedness. It has long been established that for interest to be deductible under section 163(a), the interest must be on the taxpayer's own indebtedness and not on the indebtedness of another. The interest must be paid or accrued on a valid obligation of the taxpayer claiming the *75 deduction. [Hynes v. Commissioner, 74 T.C. 1266, 1287 (1980) (citations omitted).] In Rushing v. Commissioner, 58 T.C. 996 (1972), we held that no deduction was allowable under section 163 for interest paid by a shareholder on indebtedness of their corporation which they had guaranteed. The Court reasoned that the "indebtedness upon which the interest arises in the guarantee situation is that of the primary obligor, not the guarantor, and the intention of the statute is to deny the deduction where the 'liability is secondary or indirect'," 58 T.C. 1000. See also Hynes v. Commissioner, supra; Abdalla v. Commissioner, 69 T.C. 697 (1978); Nelson v. Commissioner, 281 F.2d 1 (5th Cir. 1960), affg. a Memorandum Opinion of this Court; Golder v. Commissioner, 604 F.2d 34 (9th Cir. 1979), affg. a Memorandum Opinion of this Court. [15] In each of these guarantor cases cited herein, the Court was dealing with interest that had accrued on the indebtedness of the primary obligor at a time when the *76 guarantor's liability was still secondary and contingent. In the instant case we are called upon to decide whether interest accruing after the guarantor's liability is no longer secondary and contingent is deductible under section 163. In Arrigoni v. Commissioner, 73 T.C. 792 (1980), we dealt with a similar issue. There the taxpayers were the responsible managing officers of two Minnesota corporations. Under State law the taxpayers were liable for any sales and withholding taxes that the corporations were required to deduct, which were not paid over to the State. In addition, the taxpayers were liable for interest on any such unpaid amounts. After the two corporations failed to pay over the taxes due, the State brought suit and obtained a judgment against the taxpayers for the collection of the taxes and interest thereon. The taxpayers paid over the taxes and the interest, and claimed a deduction under section 163(a) for the amounts paid as interest. We held that the taxpayers could deduct that portion of the interest which accrued after the taxpayers became primarily liable for the obligation. Similarly, in the instant case, we believe that the interest paid by petitioners, *77 if paid at a time when petitioners were primarily liable for the obligation, is deductible under section 163(a). The mere fact that petitioners at one time were guarantors of a corporate note is not controlling. Instead, we must determine whether the interest accrued at a time when petitioners' liability was no longer secondary and indirect. Rushing v. Commissioner, supra.
Under the contract of guaranty petitioners agreed to repay the indebtedness to Suburban in the event ULTC was unable to do so. Following the insolvency of ULTC, ULTC was unable to pay off the indebtedness, and petitioners as guarantors were directly and primarily liable for the repayment of the notes under the contract of guaranty. In fact, under State law the obligation of petitioners became fixed. Hodgson v. Burroughs, 175 Md. 413, 2 A. 2d 407 (1938). Once notice and demand was made upon petitioners for payment, interest accruing subsequent to that time was recoverable against petitioners. See Walton v. Washington County Hospital Assn., 178 Md. 446, 13 A. 2d 627 (1940). The interest here involved accrued after petitioners were called upon to pay the indebtedness and during the period they were contesting *78 the liability in the courts. It was petitioners' decision to pursue this course of action. ULTC had nothing to do with it. Petitioner chose to retain the money required to pay the underlying indebtedness, and they had the use of it during the protracted litigation. Therefore, there is no question that the interest accrued against petitioners at a time when petitioners' liability was primary and direct and, accordingly, we hold that the amounts paid for the interest are deductible under section 163(a). The final issue is whether petitioners are entitled to a deduction under sections 162(a) or 212(2) for legal expenses paid with respect to litigation concerning the corporate notes. Petitioners contend that since their dominant motive in guaranteeing the notes was to protect petitioner's employment with ULTC, the legal fees incurred in defending against such business debts constitute a trade or business expense deductible under section 162(a). Alternatively, petitioners assert that if it is found that their dominant motive in guaranteeing the notes was to protect petitioners' investment in ULTC, then the legal fees incurred in defending against such indebtedness constitute an expense *79 paid for the management, conservation, or maintenance of property held for the production of income and are deductible under section 212(2). Respondent contends that petitioner's dominant motive in guaranteeing the notes was not to protect petitioner's employment with ULTC and that the expenses incurred in defending against such indebtedness are not deductible under section 162(a). Respondent further argues that section 212(2) is not applicable since the nature and origin of the claim which gave rise to the legal expenses was personal in nature, namely petitioners' desire to prevent their home from being foreclosed upon. Finally, respondent argues that even if the nature and origin of the claim was not personal, the expenses were not paid to preserve, maintain or conserve petitioner's investment since at the time the expenses were paid, petitioner's investment no longer existed as ULTC was insolvent, and therefore section 212(2) is not applicable. 15a
For the reasons set forth below, *80 we agree with petitioners and hold that the expenses are deductible under both section 162(a) and 212(2). [16]
Section 162(a) allows a deduction for all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. Section 212(2) allows a deduction for all the ordinary and necessary expenses paid or incurred during the taxable year for the management, conservation, or maintenance of property held for the production of income. However, both sections must be applied in light of section 262 which disallows deductions for personal, living, or family expenses. In resolving the question of whether amounts paid for legal fees are deductible under section 162(a) or section 212(2), or instead are nondeductible personal, living, or family expenses, we are required to look to the origin and character of the claim with respect to which the expense arose. United States v. Gilmore, 372 U.S. 39, 40 (1963). As the Supreme Court noted in Gilmore: the characterization, as "business" or "personal," of the *81 litigation costs of resisting a claim depends on whether or not the claim arises in connection with the taxpayer's profit-seeking activities. It does not depend on the consequences that might result to a taxpayer's income-producing property from a failure to defect the claim * * * [372 U.S. at 48] In the instant case, we find that the origin and character of the claim with respect to which the legal expenses arose was not personal but rather was related to petitioner's trade or business as an employee and to property petitioners held for the production of income. Petitioners guaranteed the loans of ULTC in an attempt both to save petitioner's job with ULTC[17] and to maintain and conserve their investment in ULTC and gave a deed of trust on their personal residence as further security for their guaranty. As a result of these actions, petitioners became personally liable for the debt of ULTC. McCauley then instituted a foreclosure proceeding on petitioners' personal residence in an attempt to collect this debt. Petitioners claimed they were no longer subject to the deed of trust and alternatively, that if they were, they asked the court to determine the amount of their liability. *82 The proximate cause of the legal expenses was the guarantee by petitioners of the notes of ULTC. But for the guarantee, McCauley would have never brought the foreclosure action and petitioners would not have incurred legal expenses in defending against it. Therefore, we hold that origin and character of McCauley's claim and petitioners' defense thereof was related to petitioner's trade or business and to property held for the production of income. Admittedly, as respondent contends, if petitioners were successful in defending against the foreclosure proceeding, they would have saved their personal residence. However, this incorrectly focuses on the consequence of successfully defending the claim. We are required to look to the origin and character of the claim and having done so, we hold that the claim was not personal but rather related to petitioner's trade or business and property held for the production of income. *83 Accordingly, such expenses are deductible under section 162(a) and section 212(2). [18]
Respondent argues that even if the origin and character of the claim was not personal, the expenses are still not deductible under section 212(2) since at the time petitioners paid the legal fees their investment in ULTC no longer existed, as ULTC was insolvent. We believe respondent is again focusing on the incorrect point in time. Under Gilmore, we are required to look to the time the claim originates. Here the claim originates and stems from petitioners guaranteeing the notes of ULTC. At that time petitioners were attempting in part to preserve their investment in ULTC. Indeed, respondent argued this very point in maintaining that petitioner had a nonbusiness bad debt. *84 Fuether support for our view that we must look to the time the claim originates can be found in Petschek v. United States, 335 F.2d 734 (2d Cir. 1964), revg. 223 F. Supp. 497 (S.D.N.Y. 1963). In Petschek, the taxpayer owned stock in some foreign corporations. The corporations were confiscated by the foreign governments in whose country they existed, without compensation. Later, the foreign governments set up a fund through which claims for reimbursement could be made. The taxpayer filed a claim and in doing so incurred legal fees. The taxpayer argued that he was entitled to deduct such expenses as costs incurred to maintain, conserve, and manage his interests in income producing property. The District Court disagreed, holding that the fees were not paid to manage, conserve or maintain any income producing property of the taxpayers since the property had been confiscated long before the fees were paid. The Court of Appeals reversed this decision, holding that the fact that the property had been confiscated did not preclude the application of section 212(2). Petschek v. United States, supra.Similarly, in the instant case, the fact that petitioners' investment in ULTC was no longer *85 existent at the time the expenses were paid does not preclude the application of section 212(2). [19]
Finally, we find support for our position from the cases dealing with the deductibility of trade or business expenses under section 162(a). In Dowd v. Commissioner, 68 T.C. 294 (1977), we held that: It is of no moment that petitioner was no longer conducting the same business when payment to the creditors was made because an individual cash basis taxpayer may deduct, when paid, ordinary and necessary business expenses or cost of goods sold, the liability for which arose in the active conduct of a trade or business, even if paymemt is made subsequent to the termination of that business. [68 T.C. at 301, citing Flood v. United States, 133 F.2d 173 (1st Cir. 1943); Burrows v. Commissioner, 38 B.T.A. 236 (1938); Kornhauser v. United States, 276 U.S. 145 (1928).] Although these cases dealt with section 162(a) they are helpful as interpreting the scope and application of section 212(2) since sections 162 and 212 are comparable and in parti materia with each other. Trust of Bingham v. Commissioner, 325 U.S. 365, 373, 374 (1945); United States v. Gilmore, supra. *86 Based upon the foregoing, we find that the fact that petitioners' investment in ULTC was no longer existent at the time the expenses were actually paid is insigificant. Therefore, we hold that the origin and character of the claim form which the legal expenses arose was from petitioner's trade or business and from property held for the production of income, and thus the legal expenses paid are deductible under sections 162(a) and 212(2). Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in issue. ↩
2. In his statutory notice of deficiency respondent stated that if the legal fees were deductible, they were allowable only as part of the nonbusiness bad debt under sec. 166(d), deductible as a short-term capital loss, subject to the limitations of sec. 1211. At trial, petitioner briefly alluded to the possibility such expenses were deductible under sec. 166(d). However, at trial and on brief neither party argued that sec. 166(d)↩ applied and, due to our holding herein, it is unnecessary to decide this question.
3. The parties stipulated that ULTC was indebted to First Construction for a trade receivable. However, at trial petitioner testified that the indebtedness was attributable to loans made by First Construction to ULTC and we so find. See Rule 91(e), Tax Court Rules of Practice and Procedure.↩
4. Petitioner's rate of pay in 1969 was the same as it was in 1968. However, petitioner did not work the entire year and thus his total salary received for 1969 was less than that for 1968.↩
5. The tabacco market starts in Maryland in April of each year and lasts in that State for seven or eight weeks. Thereafter, it moves sough through the other tobacco growing states and ends the following February in Kentucky and Tennessee.↩
6. In the event of nonpayment of the indebtedness by ULTC, the Waltis and petitioners were severally liable. Therefore, petitioners had a potential liability of $ 39,000 on note 1 and $ 75,000 on note 2 for total potential liability of $ 114,000 plus interest and costs.↩
7. Interest up to and including Dec. 9, 1981, had already been paid.↩
7a. Petitioners filed an informal claim for refund, based on this claim, with the IRS prior to issuance of the notice of deficiency. This claim was dealt with and disallowed in the notice of deficiency. Petitioners cited the disallowance as error in their petition and claimed an overpayment as a result thereof.↩
8. SEC. 166. BAD DEBTS. (a) General Rule.-- (1) Wholly Worthless Debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year.↩
9. In his statutory notice of deficiency, respondent determined that the $ 47,892.02 paid was not deductible since the amount of the loss had not been substantiated. However, at trial and on brief respondent did not dispute the deductibility of the loss but rather argued it was deductible as a nonbusiness bad debt under sec. 166(d)↩, subject to the limitations of sec. 1211. 10. (d) Nonbusiness Debts.-- (1) General Rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness Debt Defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.
11. No evidence was presented by petitioners as to the amount of their investment in ULTC as of Dec. 30, 1968, the date they guaranteed the notes. Since the record indicates that the petitioners' investment was increasing throughout this period we are certain that, if anything, petitioners' investment was less in 1968 than it was in 1969. Since petitioners had the burden of proof as to this issue under Rule 142(a), Tax Court Rules of Practice and Procedure↩, and we have no way of ascertaining what their investment was in 1968, we have assumed that the petitioners' investment in 1968 was the same in 1969. We arrive at the above figure by totaling petitioners' direct advances to ULTC ($ 54,000), his one-eighth stock interest in ULTC derived through his one-fourth interest in First Construction ($ 6,250), and his one-fourth interest in advances made to ULTC by First Construction ($ 11,211.39).
12. SEC. 163. INTEREST. (a) General Rule.--There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness. ↩
13. Petitioners only contend that the interest accruing from Dec. 9, 1971, to Aug. 23, 1974, is deductible. They have not claimed that the interest accruing subsequent to the insolvency of ULTC in 1969 to Dec. 9, 1971, is deductible and therefore we do not address the question.↩
14. Petitioner contends that a deed of trust is a mortgage under Maryland State law and respondent in brief and at trial does not dispute this contention.↩
15. Under Maryland law it appears that petitioners would be considered primarily liable at the time they entered into the guaranty agreements. Roth v. Baltimore Trust Co., 161 Md. 340, 158 A. 32↩ (1931).
15a. Respondent did not argue that any part of these legal expenses were capital expenditures. See United States v. Gilmore, 372 U.S. 39, 52 (1963), and United States v. Patrick, 372 U.S. 54, 57↩ (1963).
16. Petitioners did not argue that the legal expenses were deductible under section 165(c)(2). But see Rushing v. Commissioner, 58 T.C. 996↩ (1972).
17. Although petitioners were unable to show that their dominant motive in guaranteeing the notes was to save petitioner's employment, nonetheless, we believe that part of their motive in guaranteeing the notes was to save petitioner's job. See, also, n. 15a, supra↩.
18. Since we have found that the expenses were not personal but rather were releated to petitioner's trade and business and to petitioners' investment, the expenses are deductible under secs. 162(a) and 212(2). Since the expenses are fully deductible, in part under sec. 162(a) and in part under sec. 212(2), it is unnecessary to determine to what extent the deduction qualified under sec. 162(a) and to what extent under sec. 212(2).↩
19. See also Marquart v. Commissioner, T.C. Memo. 1975-117↩.