B.B. RIDER CORPORATION, Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellee.

Benjamin and Helen STRATMORE, Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellee.

B.B. RIDER CORPORATION, a/k/a General Manufacturing Corporation, Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellee.

No. 82–3585.

United States Court of Appeals, Third Circuit.

Argued Sept. 15, 1983.

Decided Jan. 24, 1984.

James D. Crawford (argued), Barry J. Fleishman, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., Edwin Fradkin, John J. O'Toole, Starr, Weinberg & Fradkin, Roseland, N.J., for appellants.

Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Chief of Appellate Section, Ann Bellanger Durney, Liza A. Prager (argued), Tax Div., U.S. Dept. of Justice, Washington, D.C., for appellee.

Before SEITZ, Chief Judge, and GIBBONS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Chief Judge.

### I.

Taxpayers Benjamin and Helen Stratmore (filing jointly) and B.B. Rider Corpo-

ration appeal from the tax court's decision that they had certain deficiencies in their income tax. *See B.B. Rider Corporation v. Commissioner,* 43 T.C.M. (CCH) 637 (1982). This court has jurisdiction over the appeal pursuant to 26 U.S.C. § 7482(a) (1976).

## II.

B.B. Rider Corporation ("Rider") was originally an authorized franchisee for the sale and servicing of Frigidaire refrigerators. Benjamin Stratmore ("Benjamin") began working for Rider in 1932, as its credit manager. About five years later, Benjamin borrowed $15,000, which he contributed to the purchase of Rider.

In the taxable years in question, Benjamin owned 25 percent of the stock in the corporation; Benjamin's wife, Helen Stratmore ("Helen"), owned 8⅓ percent; and Benjamin's two brothers each owned 33⅓ percent. At all times in question, Benjamin, as President and Chief Financial Officer, was an active and vital employee of the corporation. Helen also worked for the corporation, as Vice President and Office Manager.

In 1950, the Stratmore brothers formed General Manufacturing Corporation ("General") to manufacture aircraft engine components. The new corporation was not a financial success, and in 1957, Rider and General both filed for bankruptcy reorganization. The plan of reorganization and other relevant documents do not appear to be part of the record. Based on testimony and on the parties' stipulations, the tax court found:

> One of the consequences of the 1958 bankruptcy reorganizations of Rider and General was the placement of limitations on the maximum salaries the corporations could pay to [Benjamin] Stratmore and Helen Stratmore.... Rider and General paid their creditors only 25 cents for each dollar owed. In order to accomplish the reorganization the Stratmores agreed to forego their claims as creditors of the

corporation[s] and to honor their obligation as guarantors of the remaining 75 percent of the corporate debts.

43 T.C.M. at 651–52, 653. After the reorganization, the two corporations merged. We refer to the merged corporation as "Rider/General."

In 1961–1971, the Stratmores made payments of principal and interest on debts incurred by Rider and General that the Stratmores had guaranteed prior to the reorganization. The Stratmores took ordinary deductions for these payments on their joint tax returns. Upon examination, the Internal Revenue Service (the "IRS") determined that the payments were not deductible in full, but only as nonbusiness bad debts subject to a statutory limitation on deductions for short-term capital losses. Based on these disallowances, the IRS issued a notice of deficiency to the Stratmores in 1974.

The IRS also disallowed deductions by Rider/General for payments made to Benjamin for "travel and entertainment" in the corporation's taxable years 1961, 1964, and 1965.[1] Based on these disallowances, the IRS issued a notice of deficiency to Rider/General in 1974. In a 1977 notice of deficiency, the IRS disallowed as unreasonable Rider/General's deductions for payments made to Benjamin as "compensation" during the corporation's taxable years 1970, 1972, 1973, and 1974.

The Stratmores and Rider/General filed petitions in the United States Tax Court for review of these three notices of deficiency. The cases were consolidated for trial, and the tax court held that the IRS was correct in its disallowances. The Stratmores and Rider/General appeal.

## III.

*Payments of Principal*

In 1961 to 1971, the Stratmores made payments of principal as guarantors[2] of

---

1. Rider/General's taxable year ends on October 31. For convenience, we will refer to each taxable year by the calendar year in which it ends.

2. Although the Stratmores argue that they

debts incurred by Rider and General prior to the reorganization. The Stratmores reported these amounts as miscellaneous deductions or as employee business expenses. They contend that these payments are fully deductible against ordinary income as business bad debts under I.R.C. § 166(a).[3]

Section 166(a) sets out the general rule that any debt is deductible in the year in which it becomes worthless. Section 166(d)(1)(A) excludes from this general rule all "nonbusiness debts" of noncorporate taxpayers. A nonbusiness debt is "a debt other than ... a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or ... a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business." I.R.C. § 166(d)(2).

Under section 166(d)(1)(B), nonbusiness bad debts are deductible as short-term capital losses, but such deductions were limited to $1,000 or less for the taxable years in question, see c. 736, 68A Stat. 321 (1954) (amended in 1969); Pub.L. No. 91–172, § 513(a), 83 Stat. 487 (1969) (amended in 1976 and 1977) (current version of these statutes appears at 26 U.S.C. § 1211 (1976)).

■ The taxpayer bears the burden of refuting the IRS's determinations. *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933). The tax court agreed with the IRS that the Stratmores' payments on the corporate debts created nonbusiness bad debts. Whether a debt is a business bad debt may be a mixed question of law and fact, see *Anderson v. United States,* 555 F.2d 236, 237 (9th Cir.1977), but the relationship between a debt and the taxpayer's trade or business is a question of fact, Treas.Reg. § 1.66–5(b)(2); see *United States v. Generes,* 405 U.S. 93, 104, 92 S.Ct. 827, 833, 31 L.Ed.2d 62 (1972). We review the tax court's factual findings and inferences from fact for clear error only. *Com-*

*missioner v. Duberstein,* 363 U.S. 278, 289–91, 80 S.Ct. 1190, 1198–1200, 4 L.Ed.2d 1218 (1960); *Imbesi v. Commissioner,* 361 F.2d 640, 643 (3d Cir.1966).

■ There is no distinction between a loss that results from a direct loan to a corporation and one that results from the guarantee of a loan. *Putnam v. Commissioner,* 352 U.S. 82, 92, 77 S.Ct. 175, 180, 1 L.Ed.2d 144 (1956). If an employee of a corporation lends the corporation money primarily to protect his job, he is entitled to deduct the amounts paid as a business bad debt if the loan becomes worthless. *Trent v. Commissioner,* 291 F.2d 669 (2d Cir.1961). However, when the guarantor of a corporate debt is both a shareholder and an employee of the corporation, it is difficult to determine whether he executes his guarantee to protect his investment or to protect his job. Mixed motives are not uncommon, and the critical question is which of the taxpayer's motives is dominant. *Generes,* 405 U.S. at 103, 92 S.Ct. at 833.

The *Generes* Court sought to determine whether a shareholder/employee's dominant motive in indemnifying the underwriter of the corporation's bid and performance bonds was to protect the shareholder/employee's job or to protect his investment. The Court's decision turned on a comparison of the amount that the shareholder/employee originally invested in the corporation and the amount, after taxes, that he received annually as a salaried employee of the corporation. The Court found it implausible that the shareholder/employee would indemnify the underwriter of the corporation's bonds in order to protect an annual salary of approximately $7,000 (after federal taxes), which was less than one-fifth of his original investment of $38,900.

The shareholder/employee in *Generes* worked for the construction company only six to eight hours per week and had a

---

made interest payments as primary debtors, *see infra* text accompanying notes 9 to 10, they contend that they made payments of principal as guarantors. Because the Commissioner does not challenge this contention, we assume without deciding that it is appropriate to char-

acterize the Stratmores as guarantors with respect to their payments of principal.

**3.** All references to the I.R.C. are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years in question.

full-time job elsewhere. The tax court readily distinguishes *Generes* if the guarantor of a corporate debt is an older individual who has devoted his life to the industry in question, who has few prospects of equivalent employment [4] if he should lose his job, and whose income is primarily his salary from the corporation. *See Estate of Allen v. Commissioner,* 44 T.C.M. (CCH) 9 (1982); *LaStaiti v. Commissioner,* 41 T.C.M. (CCH) 511 (1980); *see also, e.g., Mann v. Commissioner,* 34 T.C.M. (CCH) 377 (1975); *Young v. Commissioner,* 33 T.C.M. (CCH) 397 (1974). *But see also, e.g., Massey v. Commissioner,* 43 T.C.M. (CCH) 271 (1982).

Pointing to these and other tax court decisions, the Stratmores argue that *Generes* is factually distinguishable because Benjamin was close to sixty years old when he executed the guarantees in question, and he had devoted most of his life to running Rider and General, working full time and depending on his salary and his wife's salary as his sole and irreplaceable sources of income. Although we recognize the significance of such considerations, we cannot dispense entirely with the comparison of salary and investment on which the *Generes* Court specifically relied.

As the tax court noted, there is no evidence in the instant case of what the Stratmores' salaries were when they guaranteed the loans to Rider and General. The Stratmores' combined salaries in the early 1960s were, on the average, just less than $14,000 per year [5] before taxes, but there is evidence that these salaries were artificially low due to a salary limitation to which the Stratmores agreed at the time of the reorganization.

The parties disagree over the value of the Stratmores' investment in Rider and General. The Stratmores contend that their sole investment was the $15,000 with which Benjamin purchased the Stratmores' interest in Rider in the late 1930s. The Commissioner argues that this initial investment had appreciated considerably by the 1950s, when the Stratmores guaranteed the loans in question.

Benjamin's salary when he executed the guarantees was probably not much less than his original investment of $15,000 and may have been much greater. In such a case, the degree to which the original investment has appreciated by the time the guarantees are executed may determine the tax consequences under *Generes.*[6] The question under *Generes* is whether the guarantor's dominant motivation in executing his guarantee was to protect his salary or to protect his investment. We must therefore compare the value of the guarantor's salary and of his investment at the time at which he executed his guarantee. *See, e.g., Alsobrook v. United States,* 431 F.Supp. 1122, 1128 (D.C.Ark.1977); *Estate of Allen,* 44 T.C.M. (CCH) at 16; *Young,* 33 T.C.M. (CCH) at ——.

On the basis of evidence that Rider/General's machine shop was worth approximately $500,000 in 1966 and 1967, *see* 43 T.C.M. (CCH) at 641 & n. 7, the Commissioner argues that the value of the Stratmores' investment was their one-third interest in this $500,000. The Stratmores protest that the value of the corporation's assets should be offset by the corporation's debts, and they point to evidence that the corporation had debts in excess of $1,100,-000 in 1961.

---

4. In determining whether a taxpayer could find equivalent employment, courts have looked beyond the monetary value of the job and considered whether a taxpayer who had been self-employed all his life would be able to replace the loss of this independence. *See Anderson,* 555 F.2d at 238; *Young v. Commissioner,* 33 T.C.M. (CCH) 397 (1974).

5. This does not include the substantial payments to Benjamin, nominally for travel and entertainment, that Rider/General asserts rep-

resented compensation disguised to circumvent the contractual limitation on Benjamin's salary. *See infra* text surrounding note 11.

6. The possibility that the shareholder/employee's original investment had appreciated by the time he executed the indemnity agreement would have been immaterial in *Generes* because appreciation would only increase the already significant disparity between the indemnitor's salary and his original investment.

■ We will not attempt to offset assets valued in 1966 by debts estimated in 1961, in order to guess at the corporation's actual worth in the 1950s, when the guarantees were executed. The Stratmores did not produce evidence of the value of their salaries or their investment at the time they executed their guarantees. They therefore did not carry their burden of proving that their payments of principal as guarantors of the corporations' debts were sufficiently related to their trade or business to give rise to business bad debts. *See Stratmore v. United States,* 420 F.2d 461 (3d Cir.1970), *cert. denied,* 398 U.S. 951, 90 S.Ct. 1870, 26 L.Ed.2d 291 (1970).[7] We will affirm the tax court's decision that these payments gave rise to nonbusiness bad debts.[8]

### Interest Payments

The Stratmores also paid interest on debts incurred by Rider and General. The IRS disallowed these interest deductions and determined that the payments gave rise to nonbusiness bad debts. The tax court agreed.

■ Under I.R.C. § 163(a), a taxpayer may deduct against ordinary income all interest paid or accrued in the taxable year. The general rule[9] is that the interest must pertain to a debt of the taxpayer who claims the deduction and not to the debt of another. Under *Putnam v. Commissioner,* 352 U.S. 82, 85, 77 S.Ct. 175, 176, 1 L.Ed.2d 144 (1956), when a guarantor honors his guarantee of a corporate debt, he is making payments on the corporate debt and is subrogated to the creditor's rights against the corporation. *See also Stratmore,* 420 F.2d at 465. Applying *Putnam,* interest pay-

ments by the guarantor are payments of interest on the corporation's indebtedness, and the guarantor may not deduct such payments under section 163(a). *E.g., Abdalla v. Commissioner,* 647 F.2d 487, 503 (5th Cir.1981); *Golder v. Commissioner,* 604 F.2d 34, 35 (9th Cir.1979); *Nelson v. Commissioner,* 281 F.2d 1, 4–6 (5th Cir.1960).

The tax court held that because the Stratmores paid interest on the indebtedness of Rider and General, they were not entitled to a deduction under section 163(a). The Stratmores argue that the interest they paid accrued solely as a result of agreements that they made with the creditors of Rider and General during the reorganization, which permitted the Stratmores to extend their payments as guarantors into the 1960s and 1970s. Because neither these agreements nor the original guarantee appear to be part of the record, we cannot determine the effect, if any, of the agreements on the guarantee.

The Stratmores' primary contention is that they did not pay interest on the indebtedness of another. They contend that Rider and General were discharged from their debts as part of the bankruptcy reorganization in the late 1950s, when the corporations paid their creditors twenty-five cents on the dollar and the Stratmores executed agreements acknowledging their liability for the balance of the debt. The Stratmores also agreed not to file claims in the bankruptcy proceedings as creditors of the corporations.

The Stratmores argue that these events transformed the corporations' debts into their own. They rely on the recent case of *Tolzman v. Commissioner,* 43 T.C.M. (CCH) 1 (1981). The Commissioner protests that

---

**7.** Because *Stratmore* concerns a different taxable year, it has no collateral estoppel effect. It has the same precedential effect as any other decision of this court.

**8.** The Stratmores argue that the tax court erred by not considering the purpose of the guaranteed loans and by not comparing the value of the Stratmores' investment to the amounts that they paid as guarantors. Because these argu-

ments have no bearing on our disposition of the case, we decline to reach their merits.

**9.** There is an exception for "interest paid by the taxpayer on a mortgage upon real estate of which he is the legal or equitable owner, even though the taxpayer is not directly liable upon the bond or note secured by such mortgage ...." Treas.Reg. § 1.163–1(b). This exception is not at issue.

the Stratmores presented no arguments based on *Tolzman* in the tax court. Because the briefs to the tax court are not in the record, we cannot determine what the Stratmores argued to the tax court.

■ Although a court of appeals will generally refuse to hear arguments not heard by the trial court, we have discretion to consider such arguments if necessary to avoid a clear injustice. *Singleton v. Wulff,* 428 U.S. 106, 120–21, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976); *see Hormel v. Helvering,* 312 U.S. 552, 556–59, 61 S.Ct. 719, 721–722, 85 L.Ed. 1037 (1941). The Stratmores seem to be in circumstances that strongly resemble the guarantors' situation in *Tolzman,* and if *Tolzman* controls, it might dictate a reversal of the tax court's decision with respect to the Stratmores' interest deductions.

■ In *Tolzman,* the tax court held that the guarantors of a corporate debt could take an interest deduction under section 163(a) for payments made on interest that accrued subsequent to the corporation's insolvency. The tax court reasoned that when the corporation became insolvent, the guarantors became primarily liable for the erstwhile corporate debt. *Cf. Baker v. Commissioner,* 41 T.C.M. (CCH) 1142, 1148 (1981) (payment of insolvent corporation's liability does not create a bona fide debt). The Commissioner distinguishes *Tolzman* by arguing that the record does not show whether the interest that the Stratmores paid accrued after the reorganization.[10] The tax court made no finding on this point.

We are without the benefit of the tax court's opinion on whether *Tolzman* applies to this case. Nor are we aware of any other cases in which the tax court followed the *Tolzman* rule. In the interest of justice, we will vacate the tax court's decision with respect to the interest deductions and

remand the case to the tax court to determine whether *Tolzman* applies.

*Travel and Entertainment Expenses*

Rider/General reported the following amounts paid to Benjamin and took a deduction under I.R.C. § 162(a) for the amounts listed as travel and entertainment expenses. See 43 T.C.M. (CCH) at 652.

| Taxable Year | Salary | "Travel and Entertainment" |
|---|---|---|
| 1961 | $ 8,160.00 | $ 59,615.76 * |
| 1964 | 8,300.00 | 70,103.82 |
| 1965 | 8,180.00 | 52,316.39 * |

*Although the corporation's tax return listed figures other than these, the parties agree that these figures represent the amounts at issue.

Rider/General concedes that these amounts were never intended to be used for travel and entertainment, but argues that they were deductible by the corporation against ordinary income as payments made to compensate Benjamin for his services.

■ I.R.C. § 162(a) allows a deduction for reasonable amounts paid as salary or other compensation for services rendered. The test is whether the payments were (1) reasonable in relation to the services rendered and (2) compensatory in nature. Treas.Reg. § 1.162–7. The Commissioner denies that the payments were made with the requisite intent to compensate Benjamin. *See, e.g., Paula Construction Company v. Commissioner,* 58 T.C. 1055, 1058 (1972), *aff'd,* 474 F.2d 1345 (5th Cir.1973). This is a question of fact, *id.* at 1059, on which Rider/General bears the burden of proof. The tax court agreed with the IRS, and we review for clear error only.

Rider/General explains that it disbursed the "travel and entertainment" funds to provide Benjamin with the amounts of money that the corporation would have paid him as salary if Benjamin had not agreed to limit his salary. Although the corporation did not include these payments in Benjamin's Forms W–2 and did not issue Forms 1099 for these payments, Benjamin did report as ordinary income amounts roughly

---

**10.** Although the *Tolzman* court authorized the guarantors to take a deduction for interest that accrued after the corporation's insolvency,

I.R.C. § 163(a) permits a deduction for interest "paid or accrued" during the taxable year. We

equivalent [11] to the amounts that Rider/General deducted.

The only testimony on this issue comes from Marvin Bass, Rider/General's comptroller. Bass testified that in 1966 and 1967, Rider/General disbursed "travel and entertainment" monies to Benjamin to enable him to make payments on his guarantee of debts incurred by Rider and General. The tax court appears to have inferred from this testimony that Rider/General had the same motivation for making "travel and entertainment" payments in 1961, 1964, and 1965. Rider/General argues that the use to which Benjamin put the money is irrelevant to the corporation's intent in disbursing it. Rider/General also notes that the amounts that Benjamin received in addition to his salary significantly exceeded the amounts he paid as guarantor.

The tax court held that the payments were not compensatory because they were triggered by Benjamin's needs, rather than by the services he rendered as an employee of Rider/General. This decision is difficult to reconcile on the facts with cases such as *Home Juice Company v. Commissioner*, 36 T.C.M. (CCH) 1566 (1977), *aff'd*, 601 F.2d 599 (7th Cir.1979); *General Stencils, Inc. v. Commissioner*, 24 T.C.M. (CCH) 835 (1965); and *C. Wildermann Company v. Commissioner*, 8 B.T.A. 771 (1927). We note, however, that the tax court did not address the issue of compensatory intent in these cases.

 Although the evidence is scant, it supports the tax court's conclusion that Rider/General paid Benjamin amounts in addition to his salary so that he could meet his personal obligations. Given this evidentiary support, our standard of review does not permit us to question the tax court's decision. Even if the facts would permit a different conclusion, an appellate court must affirm the tax court's determination that a corporation made payments based on personal considerations and to meet a shareholder/employee's personal obligations, if the facts are "reasonably suscepti-

ble" of this interpretation. *Snyder & Berman, Inc. v. Commissioner*, 116 F.2d 165, 167–68 (4th Cir.1940). We will therefore affirm the tax court's decision with respect to the deductions for "travel and entertainment" expenses.

### Reasonable Compensation

 A taxpayer is only entitled to deduct reasonable amounts as compensation under I.R.C. § 162(a). The IRS disallowed as unreasonable a portion of the deductions that Rider/General took for Benjamin's salary in 1970, 1972, 1973, and 1974. The reasonableness of a salary is a question of fact, *see Charles Schneider & Company v. Commissioner*, 500 F.2d 148, 151 (8th Cir. 1974), *cert. denied*, 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975), on which the taxpayer bears the burden of proof. The tax court agreed with the IRS's determinations, and we review for clear error only.

 The reasonableness of a salary depends on a number of factors, including but not limited to the services that the employee performs for the corporation, the salary that similar corporations pay for similar services, a comparison of the salary to the corporation's gross income and net income, and whether the corporation made distributions to stockholders. See *Kennedy v. Commissioner*, 671 F.2d 167, 173–74 (6th Cir. 1982) and authorities therein cited.

 There is no doubt that the services that Benjamin performed for Rider/General were extensive and valuable. Benjamin's ability to obtain financing, including his willingness to continue to guarantee corporate obligations, was vital to the survival of Rider/General. During the 1960s, ninety percent of Rider/General's business came from government contracts, and the tax court found that Benjamin did the "vast majority" of the work required to obtain such contracts. In the 1970s, he also did a

---

do not decide how to reconcile *Tolzman* and section 163(a).

11. It is especially difficult to compare the figures because the corporation's taxable year does not coincide with the calendar year.

significant amount of work on private contracts.

There is no indication, however, that Benjamin performed more or more valuable services in 1970 to 1974 than in prior years. Nor is there evidence that the corporation's financial condition improved sufficiently to warrant the large increases in Benjamin's salary that occurred between 1967 and 1974. The first table below compares the amounts that Rider/General deducted as Benjamin's salary with the amounts that the IRS allowed and disallowed as salary deductions for the taxable years 1970, 1972, 1973, and 1974. The second table shows, where available, Rider/General's gross sales, a comparison of Benjamin's salary to gross sales, Rider/General's taxable income before its net operating loss deduction, and its earned surplus and undivided profits. *See* 43 T.C.M. (CCH) at 657, 658.

| Taxable Year | Salary | Allowed | Disallowed |
|---|---|---|---|
| 1970 | $ 72,383 | $ 53,000 | $ 19,383 |
| 1972 | 122,730 | 59,550 | 63,180 |
| 1973 | 126,500 | 63,123 | 63,377 |
| 1974 | 166,365 | 66,910 | 99,455 |

| Taxable Year | Gross Sales | Salary | Salary/ Gross Sales | Taxable Income | Earned Surplus and Undivided Profits |
|---|---|---|---|---|---|
| 1967 | $ 2,256,167 | $ 41,818 | 1.85% | $ 183,977 | $ (938,381) |
| 1968 | 1,772,609 | 58,466 | 3.30% | 213,898 | (604,638) |
| 1969 | 1,676,042 | 70,591 | 4.21% | 232,719 | (486,706) |
| 1970 | 1,391,775 | 72,384 | 5.20% | 155,760 | (412,022) |
| 1974 | 1,958,731 | 166,365 | 8.49% | (21,345) | (754,684) |

Rider/General protests that it is inaccurate to compare Benjamin's salary in 1974 with his salary in 1967 because his salary was under an artificial limitation during the 1960s as a result of the reorganization agreements.[12] There is no direct evidence to indicate the date on which the salary cap was lifted. However, according to Rider/General's tax returns, the full spectrum of Benjamin's salaries from taxable year 1961 to taxable year 1974 shows amounts in the range of $8,000 until 1966, when his reported salary rose to almost $11,000. From 1967 through 1969, it leaped by annual increments of roughly ten and twenty thousand dollars to $70,591. The tax court speculated that the contractual limitation on Benjamin's salary expired in 1965. We cannot say that the tax court clearly erred by comparing the salaries that Rider/General reported paying Benjamin in the late 1960s with those it reported in the early 1970s.

Rider/General argues that the tax court ignored the amounts that Benjamin received for "travel and entertainment" during the 1960s, which should be included as part of his salary for those years as a basis of comparison. We agree with the tax court that these amounts were not part of Benjamin's salary because they were not made with compensatory intent.

The tax court found, however, that in determining whether the "travel and entertainment" payments were deductible by Rider/General, the Commissioner conceded that if these additional amounts were compensatory, the increased compensation would not be unreasonable. The Commissioner may have made this concession *arguendo,* but it is clear that neither the Commissioner nor the tax court intended this to have any bearing on the reasonableness of the deductions that Rider/General took for Benjamin's salary in the 1970s.

Rider/General had the burden of refuting the IRS's determination. Rider/General challenges the specific amounts disallowed as arbitrary, but it has failed to produce evidence that would prove that some larger

---

12. The tax court noted that Rider/General did not argue that Benjamin received compensation in the 1970s for services rendered in prior years. *Cf. Lucas v. Ox Fibre Brush Company,* 281 U.S. 115, 119, 50 S.Ct. 273, 274, 74 L.Ed. 733 (1930).

amounts represent reasonable compensation for Benjamin's services. We cannot say that the tax court clearly erred in upholding the IRS's allowances and disallowances. We will therefore affirm the tax court's decision with respect to Rider/General's deductions for Benjamin's salary.

## IV.

We will affirm the tax court's decision with respect to the deductions against ordinary income based on the Stratmores' payments of principal on the guaranteed debts. We will vacate the tax court's decision with respect to the deductions based on the Stratmores' payments of interest and remand case number 7887–74 (on the tax court's docket) to the tax court for further proceedings in accordance with this opinion.

We will affirm the tax court's decisions with respect to B.B. Rider Corporation's deductions for travel and entertainment expenses and for unreasonable salary payments.