ROSEMARY BUSSICULO, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bussiculo v. Commissioner
Docket No. 15810-82.
United States Tax Court
T.C. Memo 1987-467; 1987 Tax Ct. Memo LEXIS 463; 54 T.C.M. (CCH) 549; T.C.M. (RIA) 87467; September 16, 1987. Thomas B. Rutter and Robin E. Williams, for the petitioner. *464 Michael R. Rizzuto and Edward G. Martoglio, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in petitioner's Federal income tax for the calendar years 1978 and 1979 in the amounts of $ 17,724 and $ 43,228, respectively. After concessions, the sole issue for decision is whether the amounts paid to petitioner as salaries and bonuses by Epicor, Inc., a subchapter S corporation, constituted personal service income within the meaning of section 1348 [1] and the regulations thereunder. Resolution of this issue depends upon whether these amounts paid to petitioner constituted reasonable compensation within the meaning of section 162(a)(1), or were distributions of the corporation's earnings and profits. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated *465 herein by this reference. Petitioner Rosemary Bussiculo resided in Clark, New Jersey at the time the petition was filed in this case. Petitioner timely filed her United States Individual Income Tax Returns (Forms 1040) for 1978 and 1979 with the Internal Revenue Service Center in Holtsville, New York. During 1978 and 1979, petitioner was a 19-percent shareholder in Epicor, Inc. (Epicor), a New Jersey corporation formed in 1972 with its principal place of business located first in Springfield, New Jersey and later in Linden, New Jersey. At all times since its formation in 1972, Epicor has been engaged in the business of manufacturing and supplying powder resins, and processing and supply bead resins. These resins are used in a process called ion exchange, which is the ability of resinous materials to remove both impurities from water and radioactive materials from waste. Specifically, Epicor is involved in the commercial supplying of these ion exchange resins to utilities in the electric power generation field for their use in treating water and waste. Epicor's business also includes the supplying of water treatment and filtration equipment, as well as state-of-the-art technology *466 in the field of water decontamination for both the fossil fuel and nuclear power industries. Joseph Levendusky was Epicor's president, chairman of the board, and majority shareholder until his death in February 1982. During 1978 and 1979 Mr. Levendusky held 81 percent of the outstanding stock of Epicor. Mr. Levendusky was a recognized world authority in the field of water purification with ion exchange resins and had written several technical papers on the subject. Prior to Epicor's formation, Mr. Levendusky had been the head of the Research and Development Department at Graver Water Conditioning Company (Graver), located in Union, New Jersey. Graver was also in the ion exchange resin business. While at Graver Mr. Levendusky invented the powdered ion exchange process, a process involving pulverizing bead resin into a powder. The powder resin is superior to the bead resin for certain purification or decontamination jobs because the powder resin covers more surface area and allows more ion exchange than the bead resin. The powdered ion exchange process was one of several processes in the water treatment field on which Mr. Levendusky held United States patents. In early 1972 *467 Mr. Levendusky left Graver to form his own business, Epicor, which went into direct competition with Graver in the supplying of powder and bead resins. Prior to Epicor's formation, Graver had been the only manufacturer and supplier of powder resins in the United States. From February 1967 until Epicor's formation in 1972, petitioner had been the secretary of Graver's Research and Development Department, working principally with Mr. Levendusky. When Mr. Levendusky left Graver to start Epicor, he asked petitioner to come work for him, and she accepted. Petitioner was made an officer of the corporation (secretary) and was a member of the corporation's board of directors. In October of 1972 petitioner purchased 5 percent of the outstanding stock of Epicor, and in late 1976 she purchased an additional 14 percent of Epicor's outstanding stock. Petitioner was a 19-percent stockholder in Epicor during all relevant times thereafter. During Epicor's early years, 1972 to 1974, petitioner's time was spent setting up the new company's office procedures, files, and bank accounts and handling any necessary typing, filing, and bookkeeping. In 1975, while she was working at Epicor, petitioner *468 received a bachelor of science degree in business administration from Seton Hall University. When Epicor's production manager, Michael Lembo, and sales manager, Bruce Ogletree, left the company in the years 1975 and 1976, respectively, petitioner assumed a portion of their responsibilities. Petitioner had no training or expertise in the technical aspects of Epicor's business. However, by working closely with Mr. Levendusky for approximately ten years, petitioner became sufficiently knowledgeable in the technical aspects of the business so that she could converse with Epicor's customers and vendors over the phone, and prepare any necessary sales and purchase orders. During the calendar years 1975 through 1977 petitioner received compensation and distributions of earnings and profits from Epicor as follows: Total
Year
Salary
Bonus
Compensation
Distributions
1975
$ 30,068
$ 6,500
$  36,568
[2] $ -0-
1976
25,558
[3] 101,982
127,540
8,500
1977
35,863
57,961
93,824
33,250
*469 During 1978 and 1979, it was not uncommon for petitioner and Mr. Levendusky to work seven days a week and sometimes 14 to 16 hours a day. Petitioner was also on call 24 hours a day, as the company's business phone also rang at petitioner's personal residence. However, being on call 24 hours a day was the nature of the business since the power plants that were Epicor's customers could not schedule out their requirements, and if an emergency situation developed, the power plants needed service immediately. While Epicor's success in the ion exchange resin business was primarily traceable to the technical genius of Mr. Levendusky, by 1978 petitioner was handling most of the day-to-day business operations of Epicor. During 1978 and 1979 Epicor had two salespeople in addition to Mr. Levendusky, petitioner and Richard Hetherington. Mr. Hetherington, who had over 30-years experience in the ion exchange field, had been hired by Epicor in 1976. Mr. Hetherington's technical knowledge of the business complemented petitioner's business acumen in dealing with Epicor's customers. During 1978 and 1979, petitioner spent more than half of her time in the sales area and was primarily responsible *470 for most of the regular purchase orders the company received. Specifically, petitioner coordinated the activities required to get Epicor on the various power plants' qualified bidders list for purchases, which included meeting with purchasing agents, filling out questionnaires and forms, and furnishing any technical data or samples that might be required. Once on the qualified bidders list, petitioner prepared the bids for submission on each job. This included pricing out the quotation and any technical writing that was required. If the bid was accepted, petitioner would review the purchase order to verify that it corresponded with the bid Epicor had submitted. With respect to the delivery of the goods to Epicor's purchasers, petitioner had the responsibility of contracting the proper carrier and then following through to insure that the goods reached their proper destination. During 1978 and 1979 petitioner spent 10 to 15 percent of her time in the area of production. Petitioner had the overall responsibility of maintaining the proper inventory of raw materials and completed products, and of making sure that customer orders were properly filled and that packaging specifications *471 were being met. Petitioner held weekly production meetings with the production personnel to discuss these matters and to set production schedules. Petitioner was also involved in the purchasing of packing supplies. While it was Mr. Levendusky who made the technical decisions on which bead resin to purchase, it was petitioner who negotiated the contracts with the vendors and assured that Epicor was getting fair commercial value. During these years petitioner was also the company's quality assurance director. This job required petitioner to assure that the company's quality control procedures, which petitioner helped initiate, were being properly followed with respect to all incoming raw material, work in process, and finished product. Petitioner also performed several administrative functions for Epicor. Petitioner did all the hiring and firing of office and supervisory personnel. The warehouse supervisor, who did all the hiring and firing of the production personnel, reported directly to petitioner. Petitioner was also responsible for the collection of receivables and for all payments to vendors. Petitioner signed all of the checks on these payments. Petitioner also handled *472 the payroll, insurance, and hospital care functions for the company. Mr. Levendusky was freed of administrative responsibilities in running the business and devoted his efforts in the areas of his great technical expertise. Epicor operates on a fiscal year, with its taxable year ending on April 30. Epicor's shareholders elected to be taxed under the provisions of subchapter S of the Internal Revenue Code of 1954, as amended. During its taxable years ending April 30, 1978 and 1979, Epicor had two shareholders, petitioner and Mr. Levendusky, who respectively held 19 and 81 percent of Epicor's outstanding stock. During its year ending April 30, 1978, Epicor had gross sales of $ 6,503,794. During this year petitioner and Mr. Levendusky were paid salaries of $ 38,806 and $ 89,270, respectively. [4]Epicor's net income for the year ending April 30, 1978, excluding the bonuses declared and deducted, was $ 611,429. On June 15, 1978, a meeting of Epicor's board of directors was held. The members of the board present at this meeting were petitioner *473 and Mr. Levendusky. [5] At this meeting petitioner and Mr. Levendusky were declared bonuses for the fiscal year ending April 30, 1978, in the amounts of $ 90,000 and $ 310,000, respectively. [6] The minutes of the meeting do not reflect the basis upon which these amounts were determined, nor do they state any reasons for which the bonuses were declared. On July 10, 1978, another board of directors meeting was held, again in which petitioner and Mr. Levendusky were the only persons present. At this meeting petitioner and Mr. Levendusky were declared additional bonuses for the year ending April 30, 1978, in the amounts of $ 10,730 and $ 45,743, respectively. Again, the minutes of this meeting do not reflect the basis upon which these amounts were determined, nor do they state any reasons for which the bonuses were declared. Mr. Levendusky unilaterally determined the amounts of the bonuses, and petitioner did not know if he had used a formula to determine them. *474 Thus, Epicor declared and paid bonuses totaling $ 464,773 for its year ending April 30, 1978, of which petitioner received $ 100,730, and Mr. Levendusky received $ 355,743. Epicor's "pre-bonus" income of $ 611,429, reduced by the bonuses accrued of $ 464,773, left Epicor with taxable income for its year ended April 30, 1978, of $ 146,656. In April of 1978 Epicor made distributions out of its earnings and profits to its two shareholders totalling $ 150,000, of which petitioner received $ 28,500 and Mr. Levendusky $ 121,500. During its taxable year ending April 30, 1979, Epicor had gross sales of $ 8,784,258. During this fiscal year petitioner and Mr. Levendusky were paid salaries of $ 44,304 and $ 101,215, respectively. [7]Epicor's net income for the year ending April 30, 1979, excluding the bonuses declared and deducted, was $ 1,206,280. On July 13, 1979, a meeting of Epicor's board of directors was held. Petitioner and Mr. Levendusky were the only persons present at this meeting. At this meeting petitioner and Mr. Levendusky were declared *475 bonuses for the fiscal year ending April 30, 1979, in the amounts of $ 162,166 and $ 810,902, respectively. [8] The minutes of the meeting do not reflect the basis upon which these amounts were determined, nor do they state any reasons for which the bonuses were declared. Mr. Levendusky unilaterally determined the amounts of these bonuses. Thus, Epicor declared and paid bonuses totaling $ 983,818 for its fiscal year ending April 30, 1979, of which petitioner received $ 162,166, and Mr. Levendusky received $ 810,902. Epicor's "pre-bonus" income of $ 1,206,280, reduced by the bonuses accrued of $ 983,918, [9] left Epicor with taxable income for its year ended April 30, 1979, of $ 222,362. On July 13, 1979, Epicor made a distribution to petitioner out of its earnings and profits in the amount of $ 41,207, relating to the April 30, 1979, fiscal year. [10]
*476 Following is a comparison of officers' compensation with distributions of earnings and profits, gross sales, and net income of Epicor during the two years in issue, set out in tabular form: 1978
Total
Distributions
Officers
Salary
Bonus
Compensation
of E & P
Petitioner
$  38,806
$ 100,730 $ 139,536
$ 28,500
Mr. Levendusky
89,270
355,743
445,013
121,500
$ 128,076
$ 456,473 $ 584,549
$ 150,000
1979
Petitioner
$  44,304
$ 162,166
$   206,470
$ 41,207
Mr. Levendusky
101,215
810,902
912,117
[11] 175,672
$ 145,519
$ 973,068
$ 1,118,587
$ 216,879
Income Before
Gross
Officer
Officer
Net
Sales
Compensation
Compensation
Income
Year Ended
April 30, 1978
$ 6,503,794
$ 731,205
$ 584,549
$ 146,656
Year Ended
April 30, 1979
$ 8,784,258
$ 1,340,949
$ 1,118,587
$ 222,362
Chester Parks, who was Graver's Chemical Products Sales manager during 1978 and 1979, testified at trial. Similar to petitioner, Mr. Parks' position at Graver required him to be available to his customers on a 24-hour-a-day *477 basis. During these two years, Mr. Parks' total compensation (salary and bonus) from Graver was approximately $ 45,000 and $ 50,000, respectively. Mr. Parks had little or no knowledge about the finances of Graver or of the Chemical Products Sales Division of Graver. During this time, Graver employed one other salesman whose compensation Mr. Parks estimated to be about $ 25,000 per year. Graver also retained two outside manufacturer's representatives, who worked on a straight commission basis depending on the volume of sales they generated. Mr. Parks roughly approximated that Graver's gross sales of products that were in direct competition with Epicor in 1978 was about $ 7,000,000. Mr. Parks "guesstimated" that approximately 30 to 50 percent of Graver's gross sales that year were generated by the outside manufacturer's representatives. Mr. Parks roughly approximated that the manufacturer's representatives' commissions during 1978 and 1979 averaged out to two or three percent of their gross sales, determined using a regressive schedule (the larger the amount the lower the commission rate, with a maximum rate of 10 percent). In his notice of deficiency to petitioner dated April 2, 1982, respondent *478 determined that the amounts petitioner received as compensation from Epicor in the form of salaries and bonuses in Epicor's fiscal years 1978 and 1979, $ 139,536 and $ 206,470, respectively, were in excess of a reasonable amount within the meaning of section 162(a)(1). Respondent determined that $ 50,000 and $ 60,000, for 1978 and 1979, respectively, were the amounts of reasonable compensation petitioner received during those years. [12] Thus, respondent reduced petitioner's compensation income (personal service income) and increased petitioner's distributive share income (nonpersonal service income) from Epicor accordingly. This lawsuit ensued. *479 OPINION Respondent's reduction of petitioner's personal service income decreased the amount of petitioner's income subject to the 50-percent maximum tax rate on personal service income under section 1348, [13] and created the deficiencies determined by respondent. The sole issue for decision is whether the amounts paid by Epicor to petitioner as salaries and bonuses during the years in issue constituted reasonable compensation for services actually rendered within the meaning of section 162(a)(1), which provides: (a) In General. -- There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including -- (1) a reasonable allowance for salaries or other compensation for personal services actually rendered;
The question is one of fact to be resolved on the basis of all the facts and circumstances of the case, and no single factor is determinative. B. B. Rider Corp. v. Commissioner,725 F.2d 945, 952 (3d Cir. 1984), affg. on this issue a Memorandum Opinion of this Court; *480 Kennedy v. Commissioner,671 F.2d 167, 173 (6th Cir. 1982), revg. 72 T.C. 793 (1979); Charles Schneider & Co. v. Commissioner,500 F.2d 148, 151 (8th Cir. 1974), affg. a Memorandum Opinion of this Court, cert. denied 420 U.S. 908 (1975). Petitioner bears the burden of proving the reasonableness of the compensation. Botany Worsted Mills v. United States,278 U.S. 282 (1929). The factors considered relevant in determining the reasonableness of compensation include: the employee's qualifications; the nature, extent, and scope of the employee's work; a comparison of compensation paid with the corporation's gross and net income; the prevailing rates of compensation for comparable positions in comparable concerns; a comparison of salaries with distributions to stockholders; and whether bonuses are paid in the same ratio as stock *481 holdings. Kennedy v. Commissioner, supra,671 F.2d at 173-174; Mayson Mfg. Co. v. Commissioner,178 F.2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court. No single factor is decisive; rather, we must consider and weigh the totality of facts and circumstances in arriving at our decision. Owensby & Kritikos, Inc. v. Commissioner,819 F.2d 1315 (5th Cir. 1987), affg. a Memorandum Opinion of this Court; Mayson Mfg. Co. v. Commissioner, supra,178 F.2d at 119. In considering petitioner's qualifications to render the services she performed for Epicor, we first note that she received her bachelor of science degree in business administration from Seton Hall University in 1975. We think this education served petitioner well in both the sales and managerial functions she performed for Epicor. Also, due to the peculiarly technical nature of Epicor's business, we think the fact that petitioner had worked with Joseph Levendusky since 1967 to be of great significance when considering petitioner's qualifications. While petitioner admittedly had no formal scientific education or expertise in the ion *482 exchange resin field, we think these many years of experience working with Mr. Levendusky, a recognized world authority in the field, sufficiently qualified petitioner to effectively perform the services for Epicor during the years in issue as detailed in our findings of fact. Our findings of fact also indicate the nature, extent, and scope of the services petitioner performed for Epicor during the years in issue. During 1978 and 1979 petitioner was handling the day-to-day business operations of Epicor. During these years petitioner spent more than half of her time in the sales area and was primarily responsible for most of the regular purchase orders the corporation received. Petitioner also had some managerial responsibility in the corporation's production area and was also involved in the corporation's purchases of raw material for manufacture or resale. Petitioner also performed the majority of the corporation's administrative functions. In short, petitioner essentially handled the day-to-day operations of the business, and Mr. Levendusky handled the technical areas of his great expertise, the powder ion exchange process. Based on the record we are convinced that the *483 varied and valuable services petitioner performed for Epicor during the years in issue contributed to the success of the business and warranted the payment of substantial compensation to her. However, when we consider the other relevant factors involved, and the method that was used to compensate petitioner, we are equally convinced that a portion of the compensation received by petitioner and by Mr. Levendusky [14] was in fact a distribution of the corporation's earnings and profits. First, careful scrutiny of the compensation paid to petitioner is warranted in this case by the fact that, for the most part, the compensation was paid in proportion to petitioner's stock ownership in the corporation. During all relevant times, petitioner held 19 percent of Epicor's outstanding stock and Mr. Levendusky held the other 81 percent, and these individuals were the corporation's only officers and apparently the only directors. The record clearly establishes that Mr. Levendusky alone made the determination as to the amount of the bonuses to be *484 paid. The record does not show the basis, formula, or any other reason to explain his determination. Compare, for example, Kennedy v. Commissioner, supra, and Home Interiors & Gifts, Inc. v. Commissioner,73 T.C. 1142, 1159-1161 (1980), where there was a long-existing incentive pay agreement or contingent compensation plan that in the years in issue resulted in unexpectedly high compensation amounts. Here the only basis appears to have been stock ownership and the amount of earnings and profits at the end of the year. Of the $ 584,549 in officers' compensation Epicor paid in 1978, petitioner received 23.9 percent and Mr. Levendusky received 76.1 percent. Of the $ 1,118,587 in officers' compensation Epicor paid in 1979, petitioner received 18.5 percent and Mr. Levendusky received 81.5 percent. These figures strongly suggest that stock ownership influenced the amount of officers' compensation. This suggestion is further strengthened when we consider the amount of officers' compensation that was paid out in the form of year-end bonuses. Of the $ 584,549 in officers' compensation Epicor paid in 1978, the amount of $ 456,473, or 78 percent, *485 was in the form of bonuses. Of this amount, petitioner received $ 100,730, or 22.1 percent, and Mr. Levendusky received $ 355,743, or 77.9 percent. These bonuses were declared at two different board of directors meetings held subsequent to the end of Epicor's taxable year, when the corporation's net income for the year was known. Of the $ 1,118,587 in officers' compensation of Epicor paid in 1979, the amount of $ 973,068, or 87 percent, was in the form of bonuses. Of this amount, petitioner received $ 162,166, or 16.7 percent, and Mr. Levendusky received $ 810,902, or 83.3 percent. These bonuses were declared at a board of directors meeting, also held subsequent to the end of Epicor's taxable year, again when the corporation's net income for the year was known. Bonuses declared at the end of the year when the earnings of a business are known must be closely scrutinized. See Pacific Grains, Inc. v. Commissioner,399 F.2d 603, 607 (9th Cir. 1968), affg. a Memorandum Opinion of this Court; Ecco High Frequency Corp. v. Commissioner,167 F.2d 583, 584-585 (2d Cir. 1948), affg. a Memorandum Opinion of this Court; Boyle Fuel Co. v. Commissioner,53 T.C. 162, 171 (1969). *486 Based on the record as a whole, we find that the amounts of the bonuses paid to petitioner and Mr. Levendusky in 1978 and 1979 largely depend upon the profits of the business and the recipient's ownership interest. The corporation paid out as bonuses 74.7 percent and 80.7 percent of its "pre-bonus" net income to petitioner and Mr. Levendusky in 1978 and 1979, respectively. Moreover, petitioner, a 19-percent shareholder, received 22.1 percent and 16.7 percent of these bonuses, and Mr. Levendusky, an 81-percent shareholder, received 77.9 percent and 83.3 percent of the bonuses declared. In addition, the bonuses were declared at board of directors meetings held no earlier than 45 days after the end of each taxable year. Furthermore, the minutes of the board of directors meetings do not state any basis or formula upon which the bonus amounts were determined, nor do they state any other reasons for which the bonuses were declared. We think the pattern of paying bonuses in this manner constitutes convincing evidence that a large part of the payments was not for compensation. See Pacific Grains, Inc. v. Commissioner, supra,399 F.2d at 605-607; Huckins Tool and Die, Inc. v. Commissioner,289 F.2d 549, 553 (7th Cir. 1961), *487 affg. a Memorandum Opinion of this Court. Compare Home Interiors & Gifts, Inc. v. Commissioner, supra.
In arguing that the compensation paid to her during the years in issue was reasonable and not a distribution of the corporation's earnings and profits, petitioner points to the fact that during these years the corporation made dividend distributions to her in addition to the compensation she received. We recognize that the separate distribution of earnings and profits is a factor that may demonstrate the reasonableness of compensation paid. However, we do not place a great deal of weight on this factor in the present case for two reasons. First, we note that the amounts of the distributions to petitioner in these years, $ 28,500 and $ 41,207, are relatively small when compared to the salary and bonus paid to her, $ 139,536 and $ 206,470. The more important reason, however, is the fact that Epicor was a subchapter S corporation during the years in issue. Since Epicor was a subchapter S corporation, petitioner was required to include in her gross income her proportionate share of the corporation's net income, regardless of whether this amount was distributed *488 to her. Sec. 1373(b). [15] Petitioner's proportionate share of Epicor's net income for the years 1978 and 1979 was $ 27,865 and $ 42,249, respectively. These amounts are almost identical to the amounts actually distributed to her in these three years, $ 28,500 and $ 41,207. We do not think it is an uncommon practice for subchapter S corporations to make distributions to their shareholders of each shareholder's individual proportionate shares of the corporation's net income, since the shareholders are taxable on this amount whether or not it is distributed. Thus, the fact that Epicor made these distributions to petitioner during 1978 and 1979 sheds very little light on the issue of the reasonableness of the compensation paid to her during these years. In support of the reasonableness of the compensation paid to her, petitioner also urges us to compare her compensation to the corporation's gross sales. Petitioner's compensation in 1978 and 1979 was 2.1 percent and 2.4 percent, respectively, of Epicor's gross sales during those years. We agree *489 with petitioner that her compensation does not appear excessive when this comparison is made, but we do not think such comparison is meaningful. However, when officers' compensation is compared to net income before officers' compensation, the percentages are striking. Officers' compensation in 1978 and 1979 was 79.9 percent and 83.4 percent, respectively, of Epicor's net income before officers' compensation. We think this comparison is relevant since we have found that, for the most part, petitioner's compensation was paid in proportion to her stock ownership. We find such a high percentage of Epicor's net income being paid out to its two sole officer-shareholders, in proportion to their stock ownership, additional evidence of the fact that a large part of these payments was a distribution of earnings and profits. Finally, petitioner relies upon the prevailing rates of compensation for comparable positions in comparable concerns. The evidence in that regard is weak at best. The record reflects that the sole concern comparable to Epicor during these years was Graver. We agree with petitioner that there is no position at Graver comparable to petitioner's role at Epicor. The *490 only evidence in the record regarding the compensation paid by Graver during 1978 and 1979 is the testimony of Chester Parks, Graver's Chemical Products Sales manager during those years. Unfortunately Mr. Parks had little or no personal knowledge of financial matters of Graver or of his particular division of Graver, and his testimony was little more than guesses. It was this division of Graver, Chemical Products Sales, that was in direct competition with Epicor during the years in issue. In addition to Parks, that division of Graver's employed one other salesman and had two outside manufacturer's representatives working on a commission basis. Parks estimated his compensation from Graver in 1978 to be about $ 45,000, and estimated the salary of the other salesman to be approximately $ 25,000. Parks guesstimated that the commissions paid to the outside manufacturer's representatives in 1978 and 1979 ranged from a low of $ 42,000 to a high of $ 105,000. [16] Parks could not give any estimates of the compensation other Graver employees received for performing the other functions that petitioner performed for Epicor, other than to state that Graver's production manager at the time *491 "got paid more than I did." It cannot be determined from the record how much of each company's gross sales during these years was generated from new customers acquired during these years, and how much was generated from repeat business from customers acquired in earlier years. Thus, we think a comparison of the compensation paid to petitioner with Mr. Parks' "guesstimates" as to compensation paid to Graver's sales force provides us with little guidance in reaching a decision in this case. Petitioner nonetheless urges us to compare the compensation Graver paid in 1978 and 1979, as roughly estimated by Parks at trial, received by Parks, Graver's other salesman, the two manufacturer's representatives, Graver's *492 production manager, Graver's personnel department (which included a manager, a technical assistant, and a secretary), and the clerical personnel involved in Graver's bid preparation, with the compensation Epicor paid to petitioner, Mr. Hetherington, and John Griffiths, Epicor's warehouse supervisor. Petitioner's cumulation of Parks' best guesstimates of the compensation Graver paid to his package of employees during 1978 and 1979 simply heaps surmise upon speculation with no solid footing on which this Court can rest any conclusion. [17] Comparing these two packages of various employees' compensation, petitioner argues that we should find her compensation was reasonable. We disagree. Petitioner is arguing, in effect, that she performed the jobs of about six Graver employees, three positions of which were managerial (sales, production, and personnel). See n. 17, supra. We do not question that petitioner's services to Epicor were valuable. However, we think the evidentiary foundation is too slight to support the comparison petitioner seeks to make. In any event, we cannot draw the same conclusion from this comparison as does petitioner. Thus, we conclude that petitioner has *493 not met her burden of showing the reasonableness of her compensation during these two years. Despite that conclusion, the record in this case also does not support respondent's niggardly determination. Respondent determined that $ 50,000 and $ 60,000 were the maximum allowable amounts of reasonable compensation *494 to petitioner for 1978 and 1979. At trial and on brief, respondent unduly denigrated petitioner's varied and valuable services. We think respondent's figures are too low, possibly by as much as 50 percent, which would result in compensation in the range of $ 75,000 to $ 90,000 for those years, respectively. The record reflects that petitioner's base salaries, $ 38,806 and $ 44,304, were quite low compared to the year-end bonuses that she received, $ 100,730 and $ 162,166. We have found that the year-end bonuses were, in large part, distributions of Epicor's earnings and profits, but we think they were also in part to make up for her low salary during each year. Accordingly, we think that petitioner's base salaries for those years did not adequately compensate her for the services she rendered to Epicor. If we double the base salaries petitioner received from Epicor in its fiscal years 1978 and 1979, that would amount to $ 77,612 and $ 88,608, respectively. While we have rejected petitioner's attempts to sustain the reasonableness of her compensation by a comparison with packages of compensation of various Graver employees, we did so because of the weak factual predicate. There *495 is insufficient evidence in the record, particularly as to the salaries, duties, and responsibilities of those individuals. On the other hand, we think a package of her base salary and that of Mr. Hetherington may provide a reasonable approach and reflect reasonable compensation. This is because Mr. Hetherington was just a salesman, and petitioner handled a large portion of the regular sales plus her many other duties and responsibilities. We do not have information as to Mr. Hetherington's fiscal year base salary to determine such a package. However, figures extrapolated on a calendar basis for both petitioner and Mr. Hetherington produce amounts reasonably comparable to that achieved by simply doubling petitioner's own fiscal year base salary. [18] Accordingly, we conclude that the amounts of $ 78,000 and $ 88,000 constitute reasonable compensation (both salary and bonus) for the services actually rendered by petitioner to Epicor in the fiscal years 1978 and 1979, respectively. *496 To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure. ↩
2. From its inception in 1972 through 1975, Epicor did not make any distributions of its earnings and profits to its shareholders. ↩
3. Paragraph 14 of the parties' stipulation of facts states that petitioner's bonus for 1976 was $ 86,982. However, Epicor's payroll records for 1976, admitted as a joint exhibit, reflect that in addition to the $ 86,982 bonus petitioner received on July 14, 1976, she also received a $ 15,000 bonus on April 15, 1976. We think this was just an oversight on the part of the parties. We may disregard stipulations between parties if the evidence contrary to the stipulation is substantial. Loftin and Woodward, Inc. v. United States,577 F.2d 1206, 1232 (5th Cir. 1978); Jasionowski v. Commissioner,66 T.C. 312, 317-318↩ (1976). 4. During calendar year 1978 Richard Hetherington received salary from Epicor in the amount of $ 35,954 and a bonus of $ 3,000. ↩
5. It is not entirely clear from the record whether petitioner and Mr. Levendusky were the only members of the board of directors, but it appears that they were. ↩
6. Bonuses were also declared for three other Epicor employees, totaling $ 8,300 in the aggregate, of which Richard Hetherington received $ 3,000. ↩
7. During calendar year 1979 Richard Hetherington received salary from Epicor in the amount of $ 38,946 and a bonus of $ 4,000. ↩
8. Bonuses were also declared for six other Epicor employees, totaling $ 10,750 in the aggregate, of which Richard Hetherington received $ 4,000. ↩
9. The minutes of the July 13, 1979, meeting state that the eight bonuses declared totaled $ 983,918, when in fact they totaled only $ 983,818. It is the $ 983,918 figure, however, which was accrued and deducted on the April 30, 1979, corporate tax return. In any event, this $ 100 error has no effect on our decision in this case. ↩
10. It cannot be determined from the record whether Mr. Levendusky also received a distribution of earnings and profits relating to the April 30, 1979, fiscal year. Based on the fact that in each prior year that distributions were made petitioner and Mr. Levendusky received them in proportion to their stock ownership, we will assume that he did receive a distribution relating to the April 30, 1979, year. If Mr. Levendusky did receive a distribution proportionate to his and petitioner's stock ownership, the amount received by him would have been $ 175,672. However, this assumption is not critical to our determination of the issue in this case, particularly since Epicor was a subchapter S corporation whose income was taxable to the shareholders whether or not distributed. ↩
11. See n. 10, supra.↩
12. We note that respondent only adjusted the compensation petitioner received from Epicor for Epicor's fiscal years ended April 30, 1978, and April 30, 1979. Petitioner filed her individual returns on a calendar year basis, but since the fiscal year 1978 bonuses were all received during calendar year 1978 and the fiscal year 1979 bonuses were all received during the calendar year 1979, no distortion results from that fact. There is a rather striking correlation between petitioner's income for Epicor's fiscal year and petitioner's W-2 income for the calendar year (salary and bonus included in both) as follows: Income for Epicor's
W-2 Income for
Fiscal Year
Calendar Year
1978
$ 139,536
$ 143,556
1979
206,470
208,778
For this case, however, respondent's only adjustment to personal service income was in regard to the amounts for Epicor's fiscal years 1978 and 1979, with the practical result that the rest of petitioner's W-2 income amounts were treated as personal service income. ↩
13. Section 1348, providing a 50-percent maximum tax rate on personal service income, was repealed by section 101(c)(1) of the Economic Recovery Tax Act of 1981 (Pub. L. 97-34, sec. 101(c)(1), 95 Stat. 183), effective for taxable years beginning after December 31, 1981. ↩
14. Mr. Levendusky's case (docket No. 15539-82) was originally consolidated with petitioner's case, but was settled shortly before trial. ↩
15. Generally, subchapter S corporations are not subject to the taxes imposed on "C" corporations under section 11. Sec. 1372(b). ↩
16. Parks roughly approximated that Graver's chemical products gross sales were $ 7,000,000, and guesstimated that approximately 30 to 50 percent of these sales were generated by the manufacturer's representatives, whose commissions averaged from 2 to 3 percent. Thus, based on all these estimates and guesses, the low range of the manufacturer's representatives commissions would be $ 7,000,000 x 30% x 2% = $ 42,000, and high range would be $ 7,000,000 x 50% x 3% = $ 105,000. ↩
17. These guesstimates, as interpreted by petitioner on brief, break down as follows: 1978
1979
Parks
$ 45,000
$ 49,500
Other salesman
25,000
25,000
Manufacturer's Rep's
100,000
100,000
Production Mgr
45,000
45,000
Bid Preparation
10,000
15,000
Personnel Dept.
45,000
55,000
$ 270,000
$ 289,500
The combined compensation Epicor paid to petitioner, Hetherington, and Griffiths during those years was $ 205,103 and $ 271,183, as follows: 1978
1979
Petitioner
$ 139,536
$ 206,470
Hetherington
38,954
42,946
Griffiths
26,613
21,767
$ 205,103
$ 271,183
These comparisons mix apples and oranges. We do not know if the Graver figures are on the calendar year or a fiscal year basis. The figures for petitioner are fiscal year figures and those for Hetherington and Griffiths are calendar year figures. ↩
18. The record contains evidence only as to Mr. Hetherington's base salary on a calendar year basis. See nn. 4, 7, supra. We can extrapolate petitioner's calendar year base salary by taking her W-2 income and deducting therefrom the bonus actually received in each calendar year as follows: ↩
1978
1979
W-2 Income
$ 143,555.90
$ 208,778.00
Bonus
100,730.00
162,166.00
Petitioner's calendar year
base salary
42,825.90
46,612.00
Mr. Hetherington's calendar
year base salary
35,954.00
38,946.00
Combined Package
$ 78,779.90
$ 85,558.00