T.C. Memo. 2005-243

UNITED STATES TAX COURT

CHICKIE'S AND PETE'S, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6354-04.                    Filed October 17, 2005.

<u>Harry C. Citrino, Jr.</u>, for petitioner.

<u>Gerald A. Thorpe</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:  Respondent determined a deficiency of
$304,328 in petitioner's Federal income tax for the taxable year
ended June 30, 2000 (year at issue).

We must decide whether petitioner is entitled to deduct for
the year at issue the portion of a $902,476 payment that it made
to its sole stockholder and officer in excess of the amount of

such payment that respondent concedes petitioner may deduct.[1]  We hold that it is not.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

At the time of the filing of the petition in this case, petitioner's principal place of business was in Philadelphia, Pennsylvania.

In May 1999, the name "Chickie's and Pete's" was registered with the United States Patent and Trademark Office (U.S. Patent and Trademark office).[2]  On or about September 1, 1999, petitioner began operating a bar/restaurant under that name on Roosevelt Avenue in Philadelphia, Pennsylvania (Philadelphia). At all relevant times, Peter Ciarrocchi, Jr. (Mr. Ciarrocchi), was petitioner's sole stockholder and officer, as well as the sole stockholder and officer of 4010, Inc., which operated a bar/restaurant under the name "Chickie's and Pete's" on Robbins Avenue in Philadelphia.

On April 12, 1999, 4010, Inc., and Ogden Entertainment, Inc. (Ogden), which was operating food and beverage concessions at Veterans Stadium in Philadelphia (Ogden's Veterans Stadium

_____

[1]Respondent concedes that petitioner may deduct $441,210 of the $902,476 payment in question.

[2]The application to register the name "Chickie's and Pete's" was submitted to the U.S. Patent and Trademark office on Apr. 17, 1998.

concessions), entered into a license agreement (Ogden license agreement). That agreement provided in pertinent part:

> WHEREAS, Licensee [Ogden] operates the food and beverage concessions at Veterans Stadium in Philadelphia, Pennsylvania ("Veterans Stadium");
>
> WHEREAS, Licensee desires the right to use the Trademark [i.e., "CHICKIE'S & PETE'S" and the goodwill associated therewith] and the recipes and menu items developed, formulated and tested by Licensor [4010, Inc.] (such recipes and menu items being the "Licensed Rights") at its location at 4010 Robbins Avenue, Philadelphia * * * to identify the goods and services being licensed to Licensee under this Agreement (the "Business"); and
>
> WHEREAS, Licensor is willing to grant to Licensee a non-exclusive license to use the Trademark and the Licensed Rights in the identification and operation of Licensee's Business pursuant to the provisions contained in this Agreement.
>
> NOW, THEREFORE, in consideration of the mutual covenants and promises hereinafter set forth, the parties, intending to be legally bound, hereby agree as follows:
>
> **1.** **Grant of License.**
>
> (a) Licensor hereby grants to Licensee, subject to the provisions of this Agreement, the non-exclusive license to use the Trademark and such other variations of the Trademark as may be authorized by Licensor in the operation of a food service business together with the Licensed Rights only at * * * Veterans Stadium (the "License"). * * *
>
> (b) Except as set forth in Paragraph 1(a) above, this Agreement shall in no way limit Licensor's use of the Trademark or the Licensed Rights in its current operation or in any future endeavor which Licensor may pursue or desire to pursue, including but not limited to, operating or licensing others to operate Chickie's & Pete's concessions in any other stadium, arena or other similar venue.
>
> (c) In consideration for the granting

of this License, Licensee shall make the following payments to Licensor at the times and in the manner set out below:

    (i)  Licensee shall pay a one-time fee of Ten Thousand Dollars ($10,000.00) as an initial License fee which fee shall be paid no later than the execution of this Agreement, at which time it shall be deemed fully earned, due and payable. The initial License Fee is not refundable under any circumstances.

    (ii) As a continuing fee ("Royalty") on or before Tuesday of each week during the term of this Agreement, Licensee shall pay to Licensor a sum equal to eleven percent (11%) of the Gross Sales for the seven (7) day period ending at the close of business on the Sunday preceding such Tuesday.

    (A)  The term "Gross Sales" means all of Licensee's receipts from operations, sales, charges, fees, orders taken, services, concessions, business interruption insurance and all other revenues of any kind and nature, whether for cash or credit, in, from, about or by reason of the operation of Licensee's Business under the Trademark and Licensed Rights but excludes inter-company transfers, bona

fide credits and refunds upon return of merchandise, discounts, tips, the value of any coupon, voucher or allowance issued or granted to a customer of a restaurant in furtherance of any promotional program and which is received and credited in full or partial payment for products or services sold at the Business and amounts collected and turned over by Licensee for use tax, sales tax, excise tax and all other similar taxes (other than taxes on net income) levied by any governmental body.

2. **Licensee's Obligations and Undertakings.**

(a) * * * Licensee covenants and agrees, as part of the consideration of the issuance of this License by Licensor, that Licensee:

*      *      *      *      *      *      *

(ii) shall serve all of the menu items specified by Licensor as set forth on Schedule 2(a)(ii) attached hereto and made a part hereof[3] and shall serve only such menu items as are specified by Licensor, and shall follow all specifications and formulae of Licensor as to the contents, quality and weight of the unit or products served. In order to assure that Licensee operates in strict accordance with such standards, Licensee shall purchase the goods listed on Schedule 2(a)(ii) attached directly from

---

[3]Schedule 2(a)(ii) was not attached to the Ogden license agreement that is part of the record in this case.

Licensor or from such sources as Licensor may designate in writing from time to time; * * *

* * * * * * *

### 3. Licensor's Obligations.

Licensor agrees to provide at its own expense:

(a) an on-site manager to train License[e] and/or its employees and staff on food production, customer service, staffing and training; and

(b) all materials and information needed by Licensee to open and maintain the Business using the Trademarks and Licensed Rights, other than inventory to be used or consumed by Licensee in the operation of the Business.

Except for an initial training session that Mr. Ciarrocchi provided for Ogden personnel, neither Mr. Ciarrocchi nor any other employee of 4010, Inc., had any involvement in the management or operation of the Ogden's Veterans Stadium concessions.

On September 1, 1999, Mr. Ciarrocchi and petitioner entered into a license agreement (petitioner's license agreement). That agreement provided in pertinent part:

WHEREAS, Licensee [petitioner] operates the food and beverage bar/restaurant at 10100 Roosevelt Boulevard, Philadelphia;

WHEREAS, Licensee desires the right to use the Trademark [i.e., CHICKIE'S & PETE'S and the goodwill associated therewith] and the recipes and menu items developed, formulated and tested by Licensor [Mr. Ciarrochi] (such recipes and menu items being the "Licensed Rights") at its location at 4010 Robbins Avenue, Philadelphia * * * to identify the goods and services being licensed to Licensee under this Agree-

ment (the "Business"); and

WHEREAS, Licensor is willing to grant to Licensee a non-exclusive license to use the Trademark and the Licensed Rights in the identification and operation of Licensee's Business pursuant to the provisions contained in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and promises hereinafter set forth, the parties, intending to be legally bound, hereby agree as follows:

1. **Grant of License.**

(a) Licensor hereby grants to Licensee, subject to the provisions of this Agreement, the non-exclusive license to use the Trademark and such other variations of the Trademark as may be authorized by Licensor in the operation of a food service business together with the Licensed Rights only at * * * 10100 Roosevelt Boulevard, Philadelphia * * * (the "License"). * * *

(b) In consideration for the granting of this License, Licensee shall make the following payments to Licensor at the times and in the manner set out below:

(i) Licensee shall pay as a continuing fee ("Royalty") periodically each year Twenty-two and one-half percent (22.5%) of the Gross Sales for the yearly period September 1st through August 31st each year.

(A) The term "Gross Sales" means all of Licensee's receipts from operations, sales, charges, fees, orders taken, services, concessions, business interruption insurance and all other revenues of any kind and nature, whether for cash or credit, in, from, about or by reason of

the operation of Licensee's Business under the Trademark and Licensed Rights but excludes intercompany transfers, bona fide credits and refunds upon return of merchandise, discounts, tips, the value of any coupon, voucher or allowance issued or granted to a customer of a restaurant in furtherance of any promotional program and which is received and credited in full or partial payment for products or services sold at the Business and amounts collected and turned over by Licensee for use tax, sales tax, excise tax and all other similar taxes (other than taxes on net income) levied by any governmental body.

2.    **Licensee's Obligations and Undertakings.**

(a)   * * * Licensee covenants and agrees, as part of the consideration of the issuance of this License by Licensor, that Licensee:

*        *        *        *        *        *        *

(ii) shall serve all of the menu items specified by Licensor as set forth on Schedule 2(a)(ii) attached hereto and made a part hereof[4] and shall serve only such menu items as are specified by Licensor, and shall follow all specifications and formulae of Licensor as to the contents, quality and weight of the

---

[4]Schedule 2(a)(ii) was not attached to petitioner's license agreement that is part of the record in this case.

unit or products served.  In order to assure that Licensee operates in strict accordance with such standards, Licensee shall purchase the goods listed on Schedule 2(a)(ii) attached directly from Licensor or from such sources as Licensor may designate in writing from time to time; * * *

    *       *       *       *       *       *       *

### 3.    Licensor's Obligations.

Licensor agrees to provide at its own expense:

(a)  an on-site manager to train Licensee and/or its employees and staff on food production, customer service, staffing and training; and

(b)  all materials and information needed by Licensee to open and maintain the Business using the Trademarks and Licensed Rights, other than inventory to be used or consumed by Licensee in the operation of the Business.

During the year at issue, Mr. Ciarrocchi performed a variety of services for petitioner, including: (1) Designing the layout of petitioner's bar/restaurant, (2) developing the food products to be served at petitioner's bar/restaurant, (3) hiring all the employees of petitioner's bar/restaurant, and (4) ordering all the supplies for petitioner's bar/restaurant.

During the last six months of the year at issue, petitioner paid Mr. Ciarrocchi a so-called royalty fee of $902,476 under petitioner's license agreement (payment under petitioner's license agreement).  During the year at issue, petitioner also paid Mr. Ciarrocchi a salary of $18,000 and a management fee of

$90,000.

Petitioner filed Form 1120, U.S. Corporation Income Tax Return, for the year at issue. In that return, petitioner, inter alia, claimed a deduction of $902,476 for the payment under petitioner's license agreement.

Respondent issued a notice of deficiency (notice) to petitioner. In the notice, respondent determined to disallow the deduction of $902,476 that petitioner claimed for the payment under petitioner's license agreement.

                              OPINION

Although respondent must have commenced respondent's examination of petitioner's return for the year at issue after July 22, 1998, the parties do not address section 7491(a).[5] On the record before us, we find that petitioner has failed to carry its burden of establishing that it satisfied the applicable requirements of section 7491(a)(2). On that record, we conclude that petitioner's burden of proof, see Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933), does not shift to respondent under section 7491(a). Moreover, with respect to the deduction that petitioner is claiming for the year at issue, deductions are strictly a matter of legislative grace, and petitioner bears the burden of proving that it is entitled to the deduction claimed.

---

[5]All section references are to the Internal Revenue Code in effect for the year at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).

On brief, respondent concedes that petitioner is entitled to deduct as a royalty fee for the year at issue $441,210 of the $902,476 that petitioner claimed as a deduction for the payment under petitioner's license agreement.[6]  However, it is respondent's position that petitioner has failed to establish that it is entitled to a deduction in excess of the amount that respondent concedes.  In support of that position, respondent asserts:

> Mr. Ciarrocchi testified that he believed that peti-
> tioner should pay a higher royalty fee than Ogden [paid
> under the Ogden license agreement] because he had
> developed additional recipes for petitioner's use
> * * *.  However, both agreements [the Ogden license agree-
> ment and petitioner's license agreement] contain the same
> terms concerning the use of Mr. Ciarrocchi's family recipes.
> There is nothing in the Ogden licensing agreement that
> limits the number of recipes covered by the agreement, nor
> did Mr. Ciarrocchi testify that there were any such limita-
> tions.  Therefore, there is no basis for concluding that the
> right granted to petitioner under * * * [petitioner's]
> license agreement to use Mr. Ciarrocchi's recipes had any
> greater value than the same right granted to Ogden under
> * * * [Ogden's license] agreement * * *.  To the extent that
> Mr. Ciarrocchi provided services to petitioner that he did
> not provide to Ogden, he did so as an officer and employee
> of petitioner and not pursuant to the license agreement.

---

[6]Respondent states on brief:

Respondent concedes that the Ogden license agreement
was negotiated at arm's length and, thus, is extremely
probative evidence of the fair market value of the
rights conveyed to petitioner under * * *
[petitioner's] license agreement.  Consequently,
respondent concedes that petitioner is entitled to
deduct a royalty fee of $441,210, which is equal to 11%
of its "gross sales" as that term is defined in * * *
[petitioner's] license agreement.  [Fn. ref. omitted.]

*     *     *     *     *     *     *

Finally, there is no evidence in the record to support petitioner's contention that the disallowed portion of the royalty fee should be treated as deductible compensation for services rendered.  While I.R.C. § 162(a)(1) allows a taxpayer to deduct compensation paid, the taxpayer must establish that the parties intended the payment to be compensation for services rendered, and that the amount paid is reasonable. * * * Here, since the payment was made pursuant to * * * [petitioner's] license agreement, it is clear that it was not intended as compensation for the services Mr. Ciarrocchi rendered as petitioner's officer/employee * * *.

In any event, petitioner has provided no evidence to support the contention that it would be reasonable to allow additional compensation exceeding the $108,000 Mr. Ciarrocchi received as salary and management fees from petitioner for the services he performed as petitioner's officer and employee.  If the balance [i.e., $461,266] of the royalty fee exceeding the amount conceded by respondent is allowed as compensation, then Mr. Ciarrocchi's compensation for the taxable year ended June 30, 2000 would be $569,266. * * * the record contains no frame of reference from which to even begin the analysis the courts engage in when determining whether compensation is reasonable and, thus, deductible under § 162(a)(1).  [Fn. ref. omitted.]

It is petitioner's position that it is entitled to deduct the entire $902,476 payment under petitioner's license agreement, and not just the $441,210 that respondent concedes.  In support of that position, petitioner asserts:

taxpayer [petitioner] is providing royalties to the person [Mr. Ciarrocchi] who provided Italian recipes, and traditional family information, along with trade secrets and methods in operating this type of restaurant.  The amount paid to Mr. Ciarrocchi by the taxpayer was and is reasonable.

It is well established that for a payment to be deductible, the payer must have intended the payment to

be compensation for services rendered and it must be reasonable in amount. * * *

The complete test for royalty fees is that they are fair and reasonable and are paid for services rendered. * * *

Mr. Ciarrocchi had entered into a fair and reasonable, arm's-length license agreement with Ogden Entertainment prior into [sic] his entering into a fair and reasonable license agreement with the taxpayer [petitioner]. Since Ogden was willing to pay 11% of gross revenues (plus a $10,000.00 up-front bonus) to Mr. Ciarrocchi for his minimal participation, then the taxpayer in this matter should have expected to pay much more for Mr. Ciarrocchi's full participation and creativity.

In further support of petitioner's position, petitioner

asserts:

Ogden was permitted to use the name "Chickie's and Pete's" and the "Crabfries®" product only; Chickie's and Pete's, Inc. [petitioner] was permitted to use the name, and all of the many and varied products, recipes, spices and techniques. These additional items should more than double, and maybe even triple, the amount of royalty paid by Petitioner. The higher percentage royalty for a larger amount and variety of items is "fair and reasonable". * * *

We turn first to petitioner's contention that, pursuant to the Ogden license agreement, Ogden was allowed to use, in addition to the name "Chickie's and Pete's", only the "Crabfries®" product, and not any of the other "many and varied products, recipes, spices and techniques" that petitioner claims it was permitted to use under petitioner's license agreement. On the record before us, we reject that contention. Ogden's license agreement did not in any way limit the products of Chickie's and Pete's that Ogden was permitted to sell at Ogden's Veterans

Stadium concessions.[7]  In fact, Mr. Ciarrocchi's testimony estab-
lishes that there was no limit on the products that Ogden was
permitted to use under Ogden's license agreement.  Mr. Ciarrocchi
testified:

> With the development of the products and Chickie's and
> Pete's, we opened up in Veteran's [sic] Stadium in April of
> 1999 and I went into an agreement that you spoke of before
> with Ogden [i.e., Ogden's license agreement] * * * where I
> would sell my products at the stadium * * * they would use
> my name, my recipes and they would pay me a royalty for
> using them.

>      *     *     *     *     *     *     *

> * * * Ogden Entertainment, they came to me and
> asked if they * * * could sell my products in their
> stadium and I said, sure.  That'd be great and we
> discussed the price and we negotiating [sic] how much
> it would cost.

> It was 11 percent of the gross sales of the sta-
> dium of anything that was sold with the Chickie's and
> Pete's name * * *.

We turn now to petitioner's contentions that Mr. Ciarrocchi
performed more services for petitioner under petitioner's license
agreement than 4010, Inc., performed for Ogden under Ogden's
license agreement and that consequently it was reasonable for Mr.
Ciarrocchi to receive 22-1/2 percent of gross sales under peti-
tioner's license agreement, instead of 11 percent of gross sales,
which was the fee that 4010, Inc., was to receive under Ogden's

---

[7]See _supra_ note 3.

license agreement.[8]  Although not altogether clear, it appears

that petitioner may be arguing that it made a portion of the

$902,476 payment under petitioner's license agreement in order to

compensate Mr. Ciarrocchi for services rendered to petitioner and

that that portion is deductible under section 162(a)(1).  A

payment is deductible as compensation under section 162(a)(1) if

it is for services actually rendered to the payor in or before

the year of payment and is reasonable in amount.[9]  E.g., Lucas v.

Ox Fibre Brush Co., 281 U.S. 115, 119 (1930); sec. 1.162-7(a),

Income Tax Regs.  On the record before us, we find that peti-

tioner has failed to carry its burden of showing that any portion

of the $902,476 payment that it made to Mr. Ciarrocchi in excess

of the amount that respondent concedes is deductible as a royalty

---

[8]Pursuant to Ogden's license agreement, Ogden also agreed to make at the inception of that agreement a nonrefundable payment to 4010, Inc., of $10,000.

[9]In determining whether compensation is reasonable, we have applied the so-called multifactor test, see, e.g., Estate of Wallace v. Commissioner, 95 T.C. 525 (1990), affd. 965 F.2d 1038 (11th Cir. 1992), viewed through the lens of an independent investor, where a case is appealable to a U.S. Court of Appeals which has neither adopted nor rejected the so-called independent investor test established by the U.S. Court of Appeals for the Seventh Circuit in Exacto Spring Corp. v. Commissioner, 196 F.3d 833 (7th Cir. 1999), revg. Heitz v. Commissioner, T.C. Memo. 1998-220.  See, e.g., Haffner's Serv. Stations, Inc. v. Commissioner, T.C. Memo. 2002-38, affd. 326 F.3d 1 (1st Cir. 2003).  The instant case is appealable to the U.S. Court of Appeals for the Third Circuit.  That Court of Appeals has not adopted the so-called independent investor test but has endorsed the traditional multifactor test.  See B.B. Rider Corp. v. Commissioner, 725 F.2d 945 (3d Cir. 1984), revg. and remanding on other grounds T.C. Memo. 1982-98.

under section 162(a)(3) constitutes compensation for services rendered that is deductible under section 162(a)(1).

Based upon our examination of the entire record before us, we find that petitioner has failed to carry its burden of establishing that it is entitled to deduct for the year at issue the portion of the $902,476 payment under petitioner's license agreement in excess of the amount that respondent concedes.

We have considered all of the contentions and arguments of the parties that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing and the concession of respondent,

<u>Decision will be entered under Rule 155</u>.

[Reporter's Note:  This report was modified  by Order dated Nov. 7, 2005.]